The STATE of Ohio, Appellee,

v.

JONES, Appellant.

[Cite as *State v. Jones* (1992), 83 Ohio App.3d 723.]

Court of Appeals of Ohio,
Miami County.

No. 91–CA–27.

Decided Dec. 2, 1992.

*James D. Bennett,* Assistant Miami County Prosecuting Attorney, for appellee.

*Robert J. Huffman, Jr.,* for appellant.

FAIN, Presiding Judge.

Defendant-appellant Kelly R. Jones appeals from his conviction and sentence, following a jury trial, on two counts of rape, in violation of R.C. 2907.02(A)(2), and

one count of felonious assault, in violation of R.C. 2903.11(A)(1).[1]

Jones alleges that: (1) he was deprived of due process because the state allegedly destroyed exculpatory evidence prior to trial; (2) the court erred in denying him the opportunity to present evidence tending to show that the alleged victim failed to exhibit characteristics of rape trauma syndrome; (3) the court erred in failing to grant a mistrial after an officer mentioned that he had arrested Jones on a previous occasion; (4) the court erred in entering a conviction on felonious assault when the force employed was no more than was necessary to effectuate the rape; (5) the evidence was insufficient to support a conviction and was against the manifest weight of the evidence; and (6) the court erred in refusing to admit evidence of the victim's sexual desires with regard to another man, because that evidence was not precluded under the rape shield statute.

We conclude that Jones did not meet his burden of proving that the evidence that he alleges the state destroyed was material to his defense, that the court did not commit any prejudicial errors in its rulings, that the evidence was sufficient to support the conviction, and that the judgment is not against the manifest weight of the evidence. Therefore, the judgment of the trial court is affirmed.

I

During the early morning of November 4, 1990, Jones had a violent sexual encounter with E.F. in her boyfriend's apartment.[2] Jones contended that E.F. consented; but, as a result of that encounter, E.F. called the police and was taken to Piqua Memorial Hospital. There she was examined by a board-certified emergency room physician, Dr. Debra Poletto, in the presence of a nurse and a female police officer. Dr. Poletto testified that E.F. was crying, that she had various bruises over her body, some old, but many new and still emerging during the examination; that she had cuts on her neck and ribs, bite marks on her breast, bruised and swollen labia, a bruised cervix, pubic hair just below the cervix, a tender anus, and scrapes on the back that were consistent with rug burns. E.F. testified that Jones held her down, threatened her with a knife, hit her, dragged her off the bed so that her head hit the floor, had vaginal intercourse twice, forced fellatio with her once, and attempted anal intercourse once.

Jones did not deny having intercourse with E.F., but contended that she consented. He denied using a knife and claimed that she fabricated the story

---

1. Jones was found not guilty of one count of rape and one count of felonious sexual penetration.

2. Jones and E.F.'s boyfriend, Kipp Betts, had been friends since boyhood.

because she wanted to protect her relationship with her boyfriend, in whose apartment the incident occurred.

Jones was arrested and charged with three counts of rape, one count of felonious sexual penetration, and one count of felonious assault. He was held in the Miami County Jail pending trial.

Jones moved to dismiss the charges against him on the basis that the state had destroyed exculpatory evidence that he had been holding in his jail cell. The trial court heard testimony, reviewed exhibits, and denied the motion.

During trial, Officer Tom Christy, apparently inadvertently, testified that he had arrested Jones on a prior occasion. The court sustained an objection to that answer, but denied Jones's motion for a mistrial.

The jury returned a guilty verdict on two rape charges and the charge of felonious assault and acquitted Jones on one rape charge and the charge of felonious sexual penetration. Jones was sentenced to prison for two concurrent terms of a minimum term of fifteen years' actual incarceration to a maximum of twenty-five years on the rape charges and a concurrent term of a minimum of twelve to a maximum of fifteen years on the felonious assault charge. From the judgment and sentence, Jones appeals.

## II

We will first consider Jones's second assignment of error, which is as follows:

"A trial court errs in denying a defendant who has been charged with rape [the opportunity] to present evidence of rape trauma syndrome after the state has been permitted to offer evidence on the effect of the alleged rape upon the complaining witness."

Jones alleges that the state was permitted to offer evidence of the impact of the rape on E.F. and that, therefore, Jones should have been allowed to present rebuttal evidence to establish the nature of rape trauma syndrome ("RTS") and that E.F. was not exhibiting symptoms of RTS. Jones admits that the words "rape trauma syndrome" were never mentioned by the state, but alleges that the state asked specific questions about the impact of the rape on the victim and her projected physical and mental state in the future. Jones argues that he was denied the opportunity to present rebuttal evidence on the issue of the future harm to the victim. We disagree with his characterization of both the testimony that was given and the testimony that was excluded.

The testimony that Jones alleges "very specifically" refers to the physical and mental state of the victim in the future months and years is the testimony of the

examining physician, Dr. Debra Poletto. Dr. Poletto testified regarding her examination of E.F. in the early morning hours following the rape. Dr. Poletto testified that she had taken a history from E.F., examined her, collected evidence, and treated her. Dr. Poletto testified that E.F. was disheveled, had red eyes from crying, appeared scared, and it appeared that she had "obviously been hit." She seemed to be in a state of shock and had a shaky, quivery voice. Dr. Poletto related what E.F. had told her: that E.F. had been held down, forced to perform oral sex and forced to have sexual intercourse, that Jones used a round object inside her vagina, attempted anal sex, hit her repeatedly, threatened her with a knife at her throat, and threatened her and her daughter's lives. Dr. Poletto testified that she saw numerous fresh bruises all over E.F.'s body, neck, face, arms and legs, as well as a few older bruises that dated from the previous couple of days. She testified concerning the cuts on E.F.'s neck that were consistent with either knife cuts or a very small, thin wire held against the neck. She described the bite marks and rug burns. The bruises were worsening during the time that Dr. Poletto examined the victim and were very red, which occurs immediately following an injury, when blood is starting to leak out. The bruises included a bruise to the cervix, which was also very red, indicating that it was quite fresh. E.F. had no signs of cervical erosion, cervical infection, or cervical irritation. Dr. Poletto took swabs and cultures and other evidence for the sexual assault kit. At the end of this testimony, the prosecutor asked Dr. Poletto what her diagnosis was; the response was "alleged sexual assault" and "multiple contusions, abrasions to basically her whole body." She was then asked:

"Q. What was her prognosis then as a result of the diagnosis of alleged sexual assault and multiple contusions?"

Dr. Poletto's response was:

"A. Her prognosis is for severe psychological, emotional, social, and sexual problems. In addition to the physical trauma that she suffered and the physical injuries that she suffered from the assault and beating, and that this kind of problem takes recovery of months to years.

"Q. Doctor, were her injuries serious or severe?

"A. Her injuries were very severe."

On cross-examination, defense counsel asked Dr. Poletto to explain what "prognosis" means; she responded:

"A. Prognosis is what you would expect will happen to someone over the ensuing time, from the time that you treat them. It may be a few days, it may be a few months, or a few years. It depends—"

Defense counsel continued:

"Q.   And long term prognosis was severe psychological damage, isn't it, that I think in your words that could last months to years?

"A.   Yes, that's true of rape victims.

"Q.   And that is consistent with I believe what the medical profession characterizes as rape trauma syndrome, isn't it?

"A.   Yes, it is.

"Q.   And you would anticipate [E.F.] to display those things consistent with rape trauma syndrome, wouldn't you?

"A.   For each victim it's a slightly different timetable, but you would expect *some* of those symptoms *to develop over the months*—weeks, months, years, yes." (Emphasis added.)

Dr. Donald Schaffer, a forensic pathologist who was at one time Chief Deputy at the Montgomery County Coroner's Office, testified regarding his interpretation of E.F.'s medical records.  Dr. Schaffer did not examine E.F. personally.  In addition, defense counsel proffered testimony regarding the clinical manifestation of rape trauma syndrome from Dr. Schaffer in an effort to show that E.F.'s conduct, specifically, her writing the letters identified as Exhibits E, I, and J, her inability to show emotion, and other factors, was not consistent with rape trauma syndrome.  Dr. Schaffer did not testify that he had any knowledge or experience with rape trauma syndrome or that he had any experience or expertise in psychiatric or psychological areas.  The trial court excluded the testimony.

The defense also proffered the testimony of Dr. William Brown, a clinical psychologist, to testify regarding rape trauma syndrome.  For reasons unrelated to the rape, Dr. Brown examined E.F. and administered the Minnesota Multiphasic Personality Inventory ("MMPI") to her on January 15, 1991, which was just over two months from the time of the rape.  Dr. Brown testified that RTS is a three-step phase following the initial stressor.  The first step is the original trauma, lasting from a few hours to a few days;  the second is an outward adjustment period, the length of which varies among victims, where the victim thinks she is all right and may appear outwardly to be normal.  The third step is the long-term adjustment, where she deals with longer-term problems of readjusting in sexual relationships and working out phobic responses, etc.

Dr. Brown then identified the general diagnostic criteria for post-traumatic stress disorder ("PTSD"), as recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3 Ed.Rev.1987) ("DSM–III–R").  Exhibit P.  Rape is recognized as a stressor that can cause PTSD.

After reading a letter written by E.F., identified as Exhibit E, Dr. Brown opined that that letter written to "a perfect stranger" would be inconsistent with rape trauma syndrome, but that discussing the incident with family or friends would not be inconsistent. He said that "one of the ways that a person can feel that they haven't been dehumanized is to have a successful sexual experience with a partner and feel that they then are appropriate." He also testified that the responses are different for different victims. The trial court, without stating a reason, refused to admit the testimony.

In addition, the trial court sustained objections to questions directed to E.F. relating to whether she was experiencing specified symptoms of rape trauma syndrome. Defense counsel said that the reason he wanted to introduce testimony regarding the absence of those symptoms of rape trauma syndrome was to show "whether or not in fact the victim was raped."

The admissibility of evidence is within the sound discretion of the trial court, and prejudicial error cannot be predicated on the exclusion of evidence unless the trial court has clearly abused its discretion and a substantial right of the defendant was affected or he was materially prejudiced by the exclusion. Evid.R. 103; *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147; *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130. In our view, the trial court did not abuse its discretion in excluding evidence tending to show that the victim had not manifested certain specific symptoms of rape trauma syndrome.

Before evidence may be admitted, it must be shown to be relevant. Evid.R. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. But even relevant evidence is not admissible if its probative value is outweighed by the danger of unfair prejudice, confusion, or misleading the jury. Evidence, though relevant and otherwise unobjectionable, may nevertheless be excluded if its probative value is substantially outweighed by undue delay or the presentation of cumulative evidence. Evid.R. 403.

Jones argues that the state first introduced evidence of rape trauma syndrome and that he should have been allowed to rebut that evidence. We disagree with his characterization of the evidence. The state introduced testimony regarding the severity of E.F.'s injuries and her *prognosis* for "severe psychological, emotional, social, and sexual problems" to develop over the months and years. There was no mention of rape trauma syndrome, no description of its symptoms, and no indication that E.F. was suffering from RTS at that time. The purpose of this testimony appears to have been to establish the "serious physical harm"

element of felonious assault. We reject Jones's argument that he was merely attempting to rebut the state's evidence concerning rape trauma syndrome.

The primary use of rape trauma syndrome evidence in criminal cases is to explain the complainant's unusual behavior after the incident. See *State v. Moore* (Mar. 8, 1989), Medina App. No. 1736, unreported, 1989 WL 21233. Some Ohio courts have held that this is especially beneficial in child sex abuse cases in explaining why the · child did not report it or did not identify the person responsible. *State v. Timperio* (1987), 38 Ohio App.3d 156, 528 N.E.2d 594. Other courts have held that the use of testimony regarding rape trauma syndrome invades the province of the jury in making credibility determinations. *State v. Yockey* (Sept. 9, 1987), Wayne App. No. 2257, unreported, 1987 WL 16914; *State v. Nichols* (May 8, 1988), Cuyahoga App. No. 53729, unreported, 1988 WL 43298. However, it remains for the trial court to use its discretion in deciding whether to admit or exclude such testimony. While it appears that testimony regarding rape trauma syndrome can be useful in explaining the unusual behaviors that the syndrome comprises, especially where those behaviors would mislead the jury, it does not follow that the converse is true.[3]

In our view, the trial court reasonably could have determined that any probative value of this evidence was outweighed by its tendency to mislead or confuse the jury. To begin with, this evidence is of tangential relevance, at best. The fact that the victim had not exhibited certain specified symptoms of rape trauma syndrome five months after the rape is not of much probative value when one considers Dr. Brown's testimony that different victims react in different ways to rape—that some victims exhibit few, if any, symptoms, and that different victims exhibit symptoms during vastly different time frames.[4] Furthermore, Dr. Brown testified that during some stages of her recovery, a rape victim may appear outwardly normal.

---

3. Courts in the various jurisdictions differ regarding the propriety of the admission of evidence of rape trauma syndrome as evidence of lack of consent. Some courts have concluded that such evidence is an unfair bolstering of the credibility of the complainant. Some courts have concluded that the testimony is not relevant because the testimony cannot prove a fact in issue. The Washington Supreme Court has held that rape trauma syndrome cannot be used as proof of lack of consent, because "victims of rape may display one of two directly conflicting emotional manifestations which are referred to as 'styles.' Some women display an 'expressed style' (outwardly emotional) while others display a 'controlled style' (calm, composed and subdued). *Among the latter group, some display no visible symptoms at all.*" (Emphasis added.) *State v. Black* (1987), 109 Wash.2d 336, 344, 745 P.2d 12, 16.

4. One of the final stages in the recovery process is when the victim finally accepts what has happened, stops blaming herself for the assault, and directs her anger and rage at the perpetrator. See 12 American Jurisprudence Proof of Facts 3d (1991) 401, 426–427, and references cited therein. E.F. did seem to display a healthy anger at Jones.

Diagnosing RTS itself is complicated by the fact that a victim may not exhibit symptoms for months or years following the rape. 12 American Jurisprudence Proof of Facts 3d (1991) 401, 414–415. Thus, the fact that an alleged rape victim has not manifested certain specific symptoms of rape trauma syndrome is of little, if any, probative value, because it may signify merely that this particular victim has not manifested those particular symptoms at this stage of her recovery; she may yet show those symptoms, or she may never show them, notwithstanding that she has, in fact, been raped.

Whether a person develops RTS and the severity of its symptoms depends on a variety of factors that have nothing to do with determining whether the victim was raped. Her mental health at the time of the rape, reactions of her friends and family to the rape, and the strength of her coping mechanisms are just some of the factors that play an important part in whether she develops RTS. Besides being of marginal relevance, the alleged victim's failure to have manifested certain specific symptoms associated with RTS has the potential to mislead or confuse the jury. The jury may be tempted to conclude from the lack of certain specific symptoms that the victim must not have been raped, when, in fact, she may well have been raped, but those specific symptoms have just not been manifested, at least by the time of trial. A lay jury may be overly impressed by expert testimony that is, in fact, only weakly probative, if at all. We conclude that the trial court was within its discretion in deciding that the tendency of this evidence to have misled or confused the jury outweighed its probative value.

Jones's second assignment of error is overruled.

### III

Jones's sixth assignment of error is as follows:

"A trial court errs in refusing to admit evidence of an alleged victim's sexual desires and conduct, as the same is not precluded under Ohio's rape shield statute."

The trial court excluded from evidence several letters written by E.F. to another male inmate in the Miami County Jail. Some of these letters contained graphic passages discussing E.F.'s sexual desires concerning the man to whom she was writing. These letters were not addressed to Jones, nor did they indicate in any manner that she desired sexual contact with Jones or had ever had sexual contact with Jones other than the rape.

Jones argues, citing *In re Johnson* (1989), 61 Ohio App.3d 544, 573 N.E.2d 184, that these letters should be admitted because sexual desires are not within the scope of sexual activity and are therefore not excluded under Ohio's rape shield statute, R.C. 2907.02(D). In *Johnson*, unlike in the case before us, the evidence

of the victim's sexual desires concerned her attraction to and desire for the *defendant* prior to the alleged rape. Therefore, the court of appeals held that the letters were relevant to the consent defense.

In our case, however, the letters were written after the rape, were written to another man, and concerned the victim's desires for that other man—not Jones. Unless offered to rebut the state's evidence that a complaining witness who is alleged by the defense to have consented is either asexual or homosexual, evidence that she is of a heterosexual orientation, with heterosexual desires, is immaterial to the consent issue. A heterosexual woman with normal sexual desires and appetites is not incapable of being the victim of a rape. That she is capable of consensual sexual intercourse is no more probative of any material issue than would be proof that the alleged perpetrator of the rape is physically capable of sexual intercourse; proof of neither fact is material unless it is offered to rebut proof of the contrary proposition.

Jones argues that the rape shield statute does not preclude the admission of the letters. That statute, R.C. 2907.02(D), provides in pertinent part:

"Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and *only to the extent* that the court finds *that the evidence is material* to a fact at issue in the case *and* that its inflammatory or prejudicial nature does not outweigh its probative value." (Emphasis added.)

This statute does not require the admission of evidence; to the contrary, it restricts the admission of evidence—it excludes evidence of the victim's prior sexual activity *unless* the evidence is material to a fact at issue *and* its inflammatory or prejudicial nature does not outweigh its probative value.

The Supreme Court, in *State v. Gardner* (1979), 59 Ohio St.2d 14, 13 O.O.3d 8, 391 N.E.2d 337, established a balancing test to determine whether the application of the rape shield statute unconstitutionally abridges the defendant's due process rights to confront witnesses. The Supreme Court identified the state's interests that are advanced by the rape shield statute as follows:

"First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process." (Footnote omitted.) *Gardner*, at 17–18, 13 O.O.3d at 10, 391 N.E.2d at 340.

The interests advanced by the rape shield statute are served by not admitting the letters in question. Because the letters are not material to any fact at issue, they have no probative value; but they could be highly prejudicial to the state because jurors might be distracted from the genuine issues by the graphic nature of the letters. Further, allowing the letters into evidence would be an invasion of E.F.'s privacy that cannot be justified by any possible benefit to Jones, because the letters are not relevant to the determination of any factual issue.

Although Jones may be correct in his argument that the letters written by his alleged victim to another man are not within the scope of the rape shield statute, that does not make them relevant to any material issue in this case. Because we find that those letters are not material, we conclude that the trial court did not err in excluding them from evidence.

Jones argues further that these letters should be admitted because Jones was also charged with felonious assault and felonious sexual penetration, to which, he argues, the rape shield statute does not apply. We do not need to address the issue of whether the rape shield statute should apply to those charges standing alone, because we conclude that the letters are not relevant to any material issue in this case, regardless of the rape shield statute.

Jones also argues that the letters should have been admitted because they are probative of the fact that E.F. was not suffering from symptoms of rape trauma syndrome at the time she wrote the letters. First, whether she was suffering from rape trauma syndrome was not a fact necessary to be proven in the case. Second, Jones has not established that writing sexually explicit letters was probative of the absence of rape trauma syndrome.[5]

Jones alleges that the state put in issue the rape trauma syndrome. As discussed in Part II, above, we disagree. The trial court did not abuse its discretion in refusing to admit the letters.

Jones's sixth assignment of error is overruled.

## IV

Jones's first assignment of error is as follows:

"A defendant is deprived of his constitutional right to due process and his right to a fair trial when the state seizes from the defendant and destroys exculpatory evidence prior to trial."

_____

5. Indeed, a quick review of the literature reveals that a victim of rape who has had other social or mental disorders prior to the rape is more likely to exhibit acting-out behavior associated with alcoholism, drug use, and sexual activity. 12 American Jurisprudence Proof of Facts 3d (1991) 401, 429.

■ The victim, E.F., was also being held in jail for reasons that do not appear in the record. While she was in jail, she wrote letters to one or two other inmates, men she had met or seen there in jail. These letters were passed on to Kelly Jones, and he gave several of them to his attorney to use in his defense. These letters contained alleged inconsistencies in E.F.'s version of what happened, and some of them detailed her sexual desires and activities that she would like to engage in with the addressees of the letters.

In addition to the letters delivered to his attorney, Jones claimed that there were other letters that were confiscated and destroyed by sheriff's officers during a "shakedown" of the jail. During the hearing on the motion to dismiss the charges, Jones was not able to establish that there were in fact letters that officers confiscated; nor was he able to establish that the letters he claimed to have been destroyed were substantially different from the letters that his attorney had in his possession.

Jones argues that the prosecution's suppression of these letters violated his right to constitutional due process because the letters were evidence material to his defense in that they provided inconsistent accounts of the alleged rape. Jones argues that he was prejudiced because he could provide no exculpatory evidence at trial other than his own testimony.

■ Obviously, the prosecution's suppression of evidence material to the accused's defense is a violation of due process. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898. The test of materiality in a suppression of evidence case is whether there is a reasonable probability that the result of the proceeding would have been different had the defense known about the evidence. *Johnston, supra,* at 61, 529 N.E.2d at 911.

After reviewing the evidence, we conclude that there is no reasonable probability that the outcome of the trial would have been different had the alleged evidence been preserved. We have already determined in Part III above that the letters that Jones had and sought to introduce at trial were not relevant to any material issue in this case. Jones was unable to establish at the hearing on the motion to dismiss that the letters that he alleged to have been taken from him were substantially different from the letters in the possession of his defense attorney. With respect to his contention that the state's suppression of certain letters prejudiced him by preventing him from portraying the inconsistencies in E.F.'s version of the incident, we note that inconsistencies in the victim's account were revealed by other means, including videos of her statements to police, which were shown to the jury, an extensive cross-examination of E.F., and witnesses who testified on Jones's behalf.

Even if the trial court had found that there were letters suppressed by the state, and that these letters revealed inconsistencies in the alleged victim's recitation of the assault upon her, the trial court would have been within its discretion in finding that the probative value thereof, which was cumulative with other evidence as to the alleged inconsistencies, would have been outweighed by the potential prejudice to the state that might unfairly have resulted from the admission into evidence of intimate details of the complaining witness's sexual longings for men other than the defendant. Therefore, since the trial court could have found that the letters alleged to have been suppressed by the state would not have been admissible evidence in any event, we cannot say that the trial court erred in denying Jones's motion to dismiss the charges against him upon that ground.

Jones's first assignment of error is overruled.

V

Jones's third assignment of error is as follows:

"A trial court errs in failing to grant a mistrial following the prejudicial statements of a prosecution witness as to defendant's previous criminal history."

■ Officer Thomas S. Christy of the Piqua Police Department responded to a radio dispatch regarding the rape that identified Jones as the possible suspect. He testified that "being familiar with Mr. Jones and where his mother lives, I responded to the area of his mother's house." As he turned off the Glenwood Avenue, where Jones's mother lives, onto South Street, he saw a man who "fit the general description of Kelly Jones as I had seen him in the past" and that this man ran in the opposite direction when he saw Christy. This man ran around the west side of Mrs. Jones's house, then across the street and along the east side of a house belonging to the Wilhelms. Christy lost track of the man at that point. Christy testified that he believed the man was Kelly Jones.

On cross-examination, the defense vigorously challenged Christy's ability to recognize Jones because he was never closer than one hundred yards. On redirect, the prosecution asked Christy how he knew that the man was Kelly Jones. Christy responded: "I believed it to be him under the circumstances, from my prior knowledge of Kelly. I've dealt with him. I've arrested him in prior incidents." The defense objected, and the trial court sustained the objection. Christy then responded that he was familiar with Jones and the residence and that he expected to see Jones in the vicinity. When asked if he was sure it was Jones, he said, "I can't be one hundred percent sure, no." The defense then moved for a mistrial, and the trial court denied the motion. The defense did not

request that the court admonish the jury to disregard the testimony. The trial court did, however, generally instruct the jury as follows:

"Matters that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.

"You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been. You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered."

■ It was error for the officer to have testified that he had arrested Jones on prior occasions. Generally, reference to prior arrests of the defendant is prohibited. See, *e.g.*, *State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912. However, the trial court did sustain the objection to the statement, and the witness reformulated his answer. The statement was not inflammatory, did not appear to be intentional, and the questioning did not dwell on the subject.

■ It is within the trial court's sound discretion to determine whether a reference in the testimony to a forbidden subject merits the extreme remedy of a mistrial. *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490, 497. We conclude that the trial court did not abuse its discretion in determining that a mistrial was not merited as a result of Officer Christy's unfortunate remark.

Jones's third assignment of error is overruled.

## VI

Jones's fourth assignment of error is as follows:

"A trial court errs in entering a conviction on a charge of felonious assault, when the defendant has been convicted of rape, and the evidence proves that the force employed by the defendant was no more than was necessary to effectuate the alleged sexual assault."

■ Jones argues that "the physical condition of the complaining witness' body, therefore, was not the result of a felonious assault, but instead resulted from her consentual [*sic*] wrestling and sexual intercourse with the Defendant and the result of a fall out of bed. The record is utterly devoid of any evidence that Defendant employed any more force upon E.F. than was necessary to engage in sexual intercourse." Jones alleges that the evidence does not support a charge of serious physical harm "by any stretch of the imagination."

A person is guilty of felonious assault if he knowingly causes serious physical harm to another or causes or attempts to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A). The trial court instructed the jury

only on the element of "knowingly causes serious physical harm to another." There was abundant medical testimony regarding new and severe bruising all over E.F.'s face and body, knife cuts to the throat and body, and severe bite marks on the breast. Although Jones's testimony was in conflict with E.F.'s testimony concerning the force he used, the jury chose to believe E.F.

"Serious physical harm" is defined in R.C. 2901.01 as follows:

"(E) 'Serious physical harm to persons' means any of the following:

"(1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

"(2) Any physical harm which carries a substantial risk of death;

"(3) Any physical harm which involves some permanent incapacity, whether partial or total, or which involves some temporary, substantial incapacity;

"(4) Any physical harm which involves some permanent disfigurement, or which involves some temporary, serious disfigurement;

"(5) Any physical harm which involves acute pain of such duration as to result in substantial suffering, or which involves any degree of prolonged or intractable pain."

There was evidence from which the jury could determine that E.F. had "temporary, serious disfigurement" because of the substantial bruising over her face and body; that the knife cuts carried a substantial risk of death; or that E.F. might require prolonged psychiatric treatment because of the prognosis of "severe psychological, emotional, social, and sexual problems"; or that she suffered acute pain with substantial suffering.

Jones also argues that felonious assault is a lesser included offense of rape. This argument is also without merit. An offense is a lesser included offense of another only if the one has a lesser penalty than the greater, the greater offense subsumes all of the elements of the lesser offense and also includes other elements, and the greater offense can never be committed without the lesser offense also being committed. *State v. Thomas* (1988), 40 Ohio St.3d 213, 215, 533 N.E.2d 286, 288.

That test is not met in the present case. The elements of rape do not include knowingly causing or attempting to cause physical harm with a deadly weapon or knowingly causing serious physical harm to another; it is possible for rape to be effected without causing serious physical harm to the victim, especially when it is recalled that any penetration, however slight, is sufficient to consummate the offense. Therefore, felonious assault is not a lesser included offense of rape.

Although Jones does not specifically argue it, this assignment of error alludes to the issue of whether felonious assault and rape are allied offenses of similar import. If they are allied offenses of similar import, then it would be improper to sentence Jones on both counts.

R.C. 2941.25 provides as follows:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

*Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, at the syllabus, defined "allied offenses of similar import" as offenses the elements of which "correspond to such a degree that the commission of one crime will result in the commission of the other." The Supreme Court has created a two-tiered test to determine whether two crimes are allied offenses of similar import. The first step is a legal analysis of the elements of the two offenses to determine whether the elements are such that the commission of one crime necessarily requires the commission of the other. When the commission of the one offense necessarily results in the commission of the other, the offenses are allied offenses of similar import and the court proceeds to the next step in the analysis, to determine whether the defendant's conduct is such that he can be convicted of both offenses. If either crime was committed separately or there was a separate animus for each crime, the defendant may be convicted of both offenses. R.C. 2941.25(B). If the crimes are not committed separately or with no separate animus, the defendant can be charged with both but sentenced on only one of them. R.C. 2941.25(A).

We have already determined that the elements of felonious assault, R.C. 2903.11, and the elements of rape, R.C. 2907.02, do not overlap; each requires the proof of facts not required in proving the other. The offenses and their elements do not correspond to such a degree that the commission of the one offense will necessarily result in the commission of the other. Therefore, they are not allied offenses of similar import, and we need not address the second prong of the analysis.

Jones cites *State v. Stewart* (1980), 70 Ohio App.2d 147, 24 O.O.3d 198, 435 N.E.2d 426, for the proposition that one can be convicted of both felonious assault and rape only when the evidence establishes that the assault was far in excess of

that required to force the victim to submit to the rape. His reliance on that case is misplaced. The *Stewart* court specifically did not decide whether felonious assault and rape are allied offenses of similar import, but upheld the convictions on both the felonious assault and the rape counts because the defendant could not show that the prosecution relied on the same conduct to support both offenses. While the court did comment that the assault was made with force far in excess of that required to force the victim to submit to the rape, that comment was not a part of its holding and does not change the analysis.

The trial court did not err in sentencing on both the felonious assault and rape charges.

Jones's fourth assignment of error is overruled.

## VII

Jones's fifth assignment of error is as follows:

"A trial court errs in entering a judgment of conviction against a defendant when the evidence is insufficient to sustain a conviction and the judgment is against the manifest weight of the evidence."

Jones essentially argues that E.F.'s testimony is so inconsistent that it is incredible. We disagree.

Credibility is a question of fact to be determined by the jury, and the reviewing court should not substitute its judgment for that of the jury. Where there is testimony in the record that, if believed, would persuade the average mind of guilt beyond a reasonable doubt, a conviction may not be reversed as being against the manifest weight of the evidence. *State v. Walker* (1978), 55 Ohio St.2d 208, 213, 9 O.O.3d 152, 155, 378 N.E.2d 1049, 1052. In the case before us, the testimony of the complaining witness, E.F., if believed, would persuade the average mind of guilt beyond a reasonable doubt.

Jones's fifth assignment of error is overruled.

## VIII

All of Jones's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

WILSON and GRADY, JJ., concur.