OPINION
Draco Crawl was found guilty after a bench trial of aggravated menacing. The court imposed a ninety-day jail sentence and suspended eighty-one days, a $500 fine and suspended $400, and court costs. The court also placed Crawl on probation for two years. Crawl appeals, advancing two assignments of error:
 1. THE EVIDENCE TO SUPPORT THE CONVICTION WAS INSUFFICIENT AS A MATTER OF LAW, BECAUSE THE THREAT OF A RAPE IS NOT SYNONYMOUS WITH THE THREAT OF SERIOUS PHYSICAL HARM.
 2. THE CONVICTION SHOULD BE REVERSED BECAUSE THE PROSECUTION'S VERSION OF THE FACTS WAS STRONGLY REBUTTED BY THE DEFENSE'S; THUS, THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
R.C. 2903.21 defines aggravated menacing, as pertinent to this case, as knowingly causing another to believe that the offender will cause serious physical harm to that person.
"Serious physical harm" is defined at R.C. 2901.01(A)(5) as:
 (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 (b) Any physical harm that carries a substantial risk of death;
 (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
The first assignment presents the legal question of whether the State's evidence was sufficient to establish the elements of aggravated menacing. The State's evidence was as follows:
Mercedes Parker, the alleged victim, was nine years old and in the fourth grade on February 11, 1999, the date of the alleged offense. She testified that she returned home after school on February 11 and no one was home. She was in her front yard when her next door neighbor, Draco Crawl, in the company of two other people, told her "that his dad had killed my dogs and had raped my aunt and he would rape me too." She stated that she "was scared . . . that he was going to do something nasty to her," i.e., what he had threatened to do which was rape her. Mercedes stated that rape was "(s)omebody having sex with you . . . (w)ithout my permission." She stated that she went to Donna Nipp's house which was five houses away from hers and told Nipp "that Draco Crawl said he was going to rape me. . . ."
Donna Hacky, whom Mercedes referred to as Donna Nipp, testified about what the trial court found to be an excited utterance upon Mercedes' arrival at her house:
 She said, Donna, Donna. So I went out into the gate and I asked her what was wrong. At that time, she took and told me, she said — I don't know, she said they're going to rape me, which she was meaning Draco was going to rape her and his friend. And she said can I use your telephone. I said yeah, come on in, I said you can come in.
 And normally when she comes in my house, she sits on the couch. This time she stood at the door real scared. She would not move from the door.
 Q. And that was very unusual behavior for what you had noticed in the past?
A. Uh-huh.
Gloria Sanders, Mercedes' grandmother, testified that the child lived with her on February 11, and that she was under the ongoing treatment of a psychologist related solely to the incident in question. Sanders testified that Mercedes had not received psychological treatment prior to the incident, and that she had had ten sessions with the psychologist in the six-month period between February 11 and the August 12 trial.
The gist of Crawl's argument under the first assignment is that because the offense of rape, by definition, does not require the infliction of serious physical harm upon the victim, a threat of rape is not a threat to do serious physical harm and cannot support a belief that one will suffer serious physical harm. Crawl cites our opinion in State v. Jones (1992), 83 Ohio App.3d 723, wherein we held that felonious assault is not a lesser included offense of rape and that felonious assault and rape are not allied offenses of similar import, and observed that "it is possible for rape to be effected without causing physical harm to the victim. . . ." P. 738.
While we agree with Crawl that rape can be accomplished without the infliction of serious physical harm, we do not agree that threatening rape cannot, as a matter of law, cause the person so threatened to believe that the person making the threat will cause him or her serious physical harm. It is common knowledge that rape is often accomplished by violence. Jones, supra, relied upon by Crawl, is but one example, where Jones was convicted both of rape and felonious assault, i.e. the infliction of serious physical harm. We are well satisfied that a threat of rape is sufficient to cause a belief that the threatener will cause serious physical harm to the person so threatened even though the threatener does not also state that the rape will be accompanied one or more of the types of serious physical harm defined by R.C.2901.01(5). See also State v. Malone (1984), 15 Ohio App.3d 123, wherein the Court of Appeals for Summit County held that the rape of a theft victim was properly considered by the jury on the question of whether serious physical harm had been inflicted or had been attempted to be inflicted, so as to make the theft offense one of aggravated robbery; State v. Alphonso Calhoun (Nov. 24, 1991), Cuyahoga App. No. 59369, unreported, which citesMalone, supra, and is to the same effect; State v. Terry Phillips
(Oct. 14, 1993), Cuyahoga App. No. 62690, unreported, wherein the court cited the 1974 Committee Comment to H 511, which enacted R.C. 2907.02 defining rape:
 First, the acts contemplated include anal intercourse, cunnilingus, and fellatio in addition to vaginal intercourse, because any of such acts can result in serious physical or psychic harm to the victim when committed under circumstances amounting to rape.
* * *
 Fourth, the section designates as rape sexual conduct with a pre-puberty victim, regardless of whether force or drugs are used, and regardless of whether the offender has actual knowledge of the victim's age. The rationale for this is that the physical immaturity of a pre-puberty victim is not easily mistaken, and engaging in sexual conduct with such a person indicates vicious behavior on the part of the offender.
Having concluded that a threat of rape is sufficient to support a belief that the threatener will cause the person so threatened to believe the threatener will cause him or her serious physical harm, we also conclude that the State's evidence was sufficient to establish that Mercedes harbored such a belief as a result of Crawl's threat.
The first assignment is overruled.
In his second assignment, Crawl contends that his conviction was against the weight of the evidence. The analysis to be utilized by a reviewing court was recently discussed in State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. At 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721. ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").
Crawl presented four witnesses in addition to himself. His mother, Crista Crawl, said her son was home all day February 11 recovering from a gunshot wound. She testified that he didn't leave the house that day although he stepped outside the door to say goodbye to two "guys" who had been visiting him. She testified that she didn't see Mercedes that day and didn't hear her son yell anything, although her windows were up on an unusually warm February day.
Anginette Coleman, the principal at the school Mercedes attended before being removed by her grandmother, opined that Mercedes was "capable of telling the truth (and) also capable of fabricating." She said Mercedes had been referred to her for discipline "some" but not "several" times. She said the grandmother put Mercedes in a different school in an effort to alleviate problems between Mercedes and the Crawl's daughter, Tia, and between the two families.
Larry Crawl, Draco Crawl's father, testified that he was working in his front yard on the afternoon of February 11, cleaning up the yard and washing his van. He said he didn't see Mercedes and although he saw his son's friends outside, he didn't see his son outside.
Victor Champion testified he had been at Crawl's house 5 — 6 hours on February 11, and that he, Crawl, and Champion's cousin Juan "were out on the front porch area for about 20 minutes." He said he didn't see Mercedes or see Crawl yelling.
Crawl himself testified he hadn't seen Mercedes that day or given her any reason to accuse him.
It is the province of the trial court to resolve issues of credibility. The trial court did not explain its verdict. Crawl contends that the verdict is against the manifest weight of the evidence because a recovering gunshot victim is not likely to pick a fight with a little girl, and Mercedes has "a history of lying and an admitted `beef' with the (Crawl) family." We are not persuaded. From our review of the record, Crawl exaggerates the testimony of Anginette Coleman as to Mercedes' veracity. Furthermore, there is no reason to think that the "beef" was not reciprocal. Finally, a nineteen-year-old recovering gunshot victim, standing on his porch with two friends, is not constrained by his condition from uttering a threat to a nine-year-old girl. Significant to us in weighing the evidence is the excited utterance of which Donna Hacky testified and the unrefuted testimony of Gloria Sanders that her granddaughter was regularly seeing a therapist as a result of this incident. In short, we are not persuaded that the trial court lost its way.
The second assignment is overruled.
 ____________________________ WOLFF, J.
GRADY, P.J. and BROGAN, J., concur.