OPINION
{¶ 1} Anthony Chambers appeals from his conviction of rape of a child under thirteen and one count of felonious assault after a jury trial. Chambers was sentenced to life imprisonment on the rape charge and eight years on the felonious assault charge. The terms were to be served consecutively.
 {¶ 2} The facts are set out in the State's brief and are as follows:
 {¶ 3} On May 14, 2004, Bianca Chambers left her 19 month old girl (who we will refer to as T.C.) in the care of her brother, Anthony Chambers. The next night, Bianca noticed bruising around the child's anal area and a brown discharge. Bianca immediately called the police department.
 {¶ 4} Dayton Police Officers Phillip Adams and Jennifer Stack were dispatched to Bianca's home. The officers observed the injuries to the child and spoke with Bianca, who advised them that her brother, Anthony, babysat her the night before. The police took Bianca and her child to Children's Medical Center (CMC).
 {¶ 5} Dr. Susan Henry, the emergency room pediatrician at CMC, examined the child and she concluded that the child had been anally penetrated. The child's anal area exhibited large tears and bruising and her rectum was dilated and a green discharge was present. A rape-kit was administered and the child's clothes and diaper was also collected as evidence. At approximately 2:00 a.m. the next morning, Dr. Henry notified the police officers and Bianca of her sex abuse diagnosis, treated and discharged the child to Montgomery County Children's Services (MCCSB).
 {¶ 6} Detective Phillip Olinger was dispatched to CMC at approximately 3:30 a.m. on the report of a rape of a young child. Olinger arrived at CMC at approximately 4:00 a.m., gathered information from the doctors, other officers, and Bianca and then left to search for Chambers. On May 14, 2004, at approximately 2:30 p.m., Chambers was arrested at his girlfriend's home. He was transported downtown to be interviewed. When they arrived, Detective Olinger removed the handcuffs, offered Chambers a drink, read Chambers his Miranda Rights, and after he waived them, interviewed Chambers concerning the rape charge. The interview lasted several hours from 2:50 p.m. to 6:00 p.m. During this time, both Detective Olinger and Detective Theresa Lawson interviewed Chambers and Chambers wrote a total of four statements. [Initially, Chambers denied the allegations and then admitted to being the only one with custody and control of the child and admitted to penetrating the child's anus with his penis.]
 {¶ 7} Two days after her release from CMC, the child's foster parents brought her back to CMC complaining that the child was lethargic and complaining of abdominal pain, that she has been running a fever and had a dark, bloody discharge coming from her anus. Dr. Jeffrey Christian, a pediatric surgeon on staff at CMC, examined the child and found the child's heart rate incredibly increased and the child in septic shock. Dr. Christian determined that the child's bowel was perforated causing air and contents from her intestines to leak into her abdominal cavity. Dr. Christian performed emergency surgery, as the child would have died within two days without it. The child was placed under a general anesthesia and was cut from her belly button to the top of her pubic bone. Dr. Christian verified that her bowel was perforated and also uncovered the injury to her rectum and determined that she was penetrated with an object consistent with a male penis. There was also evidence of genital warts. Two additional surgeries were necessary to fully correct the problem.
 {¶ 8} Dr. Ralph Hicks, a pediatrician at CMC, also opined that the injury suffered was consistent with penile-anal penetration. Dr. Christian referred the child to Dr. Hicks for an inpatient consultation. Dr. Hicks examined the child and found multiple lacerations at her anal opening, bruising, discharge, and genital warts. [Dr. Hicks explained that genital warts are a sexually transmitted disease, transmitted by skin to skin contact with another person who has the disease, but may not be exhibiting the warts.] The incubation period for contracting the warts is anywhere from three weeks to many years and he opined that if the child contracted the disease on May 13, 2004, it would be consistent with the incubation period.
 {¶ 9} In his first assignment, Chambers argues that the trial court erred in convicting him because the State failed to prove the "corpus delicti" of the crimes of rape and felonious assault outside of his confession. The State argues that it proved the corpus delicti of these crimes independent of Chambers' confession because it proved that Chambers had sole access to the child before her injuries were discovered and those injuries were consistent with rape and felonious assault.
 {¶ 10} "[T]he corpus delicti of a crime consists of the act and the criminal agency of the act and must be established by evidence outside of a confession before the confession is admissible. See State v. Maranda (1916), 94 Ohio St. 364,114 N.E. 1038, paragraphs one and two of the syllabus; see, also,State v. Van Hook (1988), 39 Ohio St. 3d 256, 261,530 N.E.2d 883. `The quantum or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case.'Maranda, supra, at paragraph two of the syllabus. Rather, `[i]t is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged.' Id. The rule does not require evidence upon all elements of the crime but only `some material element.' Van Hook, supra, at 262, quoting Maranda, supra, at paragraph two of the syllabus. The corpus delicti rule is designed to protect `persons who confess to crimes that they not only did not commit themselves, but which were never committed by anyone.' State v. Nobles
(1995), 106 Ohio App.3d 246, 261-62, 665 N.E.2d 1137." State v.Jennings, Clark App. No. 2002CA78, 2003-Ohio-4429, at ¶ 19.
 {¶ 11} The State produced medical testimony that the child's anal injury was consistent with anal penetration by a male penis. There was medical testimony that the child suffered serious physical harm. There was testimony by the child's mother that the defendant had sole custody and control of the child before her injury was discovered. In short, the State produced some evidence outside of Chambers' confession to prove some material element of both crimes charged. The first assignment of error must be Overruled.
 {¶ 12} In his second assignment, Chambers argues that the trial court erred in overruling his motion to suppress the confession he gave to the police. Chambers contends that his statements to the police were involuntary and inadmissible. Chambers contends he was not advised of his Miranda rights prior to confessing, that he was interrogated over three and one-half hours, misled concerning the strength of the State's case against him, and led to believe he would receive more lenient treatment if he confessed to committing the rape of the child.
 {¶ 13} The State argues that the police officers never promised Chambers that he would get a reduced sentence if Chambers confessed. Further, the State argues that it did not misrepresent the strength of its case against Chambers.
 {¶ 14} At the suppression hearing, Detective Phillip Olinger testified that he arrested Chambers and transported him to the police department in the afternoon of May 14, 2004. Olinger stated he advised Chambers of his Miranda rights and advised him he wanted to talk to him about the crime of rape.
 {¶ 15} Olinger said Chambers told him he had completed 13 years of schooling and he would agree to talk to Olinger about the accusation of rape against him. Olinger said Chambers initially provided a written statement to him in which he denied the rape. (Ex. 3). Olinger said Chambers asked him about the possibility of him going to jail or to prison. Olinger testified as follows:
 {¶ 16} "A. We were talking about the allegations that we had information that something had happened to the child. I asked him if he would tell the truth, and he stated if he did, would he go to prison.
 {¶ 17} "At that point I advised him that he was under arrest for rape, that he would be going to jail, and that I would talk to the prosecutor about the charges, and then I would get all the information through the court; that I was a mutual fact-finder, that I wanted to get his side of the story.
 {¶ 18} "Q. In your opinion, detective, did you make it clear to Mr. Chambers that he was going to jail at the conclusion of your interview?
 {¶ 19} "A. From the whole interview he was advised he was under arrest for rape and he was going to jail, yes, ma'am."
 {¶ 20} Olinger said Chambers provided him another written statement in which Chambers again denied he engaged in any sexual activity with the child. In that statement Chambers indicated he didn't need to go to prison, he just needed counseling. (State's Ex. 4). Olinger said he then told Chambers they would take a twenty minute break and he let Chambers use the restroom. Olinger said he then had Detective Lawson interview Chambers briefly and then he prepared nine questions for Chambers to answer which Chambers did. In this statement, Chambers admitted he placed his penis in the child's rectum. (State's Ex. 5). Olinger said he then left Chambers alone to prepare his own narrative statement which he did. In that statement, he again admitted to sexually abusing the child. (State's Ex. 6). Olinger denied making any promises to Chambers in exchange for his cooperation. (Mot. 39).
 {¶ 21} On cross-examination, Olinger stated he never mentioned to Chambers that he faced life imprisonment for the rape. He denied telling Chambers that if he admitted the rape, he would be charged with incest instead. (Mot. 59). He denied telling Chambers that if he admitted something, he could go home. He admitted that by the time Chambers made his last statement he had been in custody three hours. (Mot. 64). Olinger admitted he told Chambers that the police may have DNA evidence which could link him to the crime. He denied using hand gestures to describe the length of sentence Chambers faced if he refused to admit to the rape. (Mot. 67). Finally, he denied telling Chambers that if he admitted doing something, he wouldn't have to go to prison. (Mot. 68).
 {¶ 22} Detective Lawson testified she was present at the beginning of the interrogation of Chambers and she said she "laid the case out to him" and Chambers said he would tell the officers the truth. Lawson said she told Chambers to tell Olinger what happened and she left the interview room. (Mot. 82). She testified she did not know whether Olinger made any promises or innuendos that if Chambers admitted to doing something, he would receive a lesser penalty. She also denied seeing Olinger use hand gestures to describe what would happen to Chambers if he would not admit to the crime. (Mot. 84).
 {¶ 23} Chambers testified that he was not read his Miranda
rights until after he gave Olinger a statement. He testified that Olinger told him if he cooperated he would be able to leave the police station. (T. 93). Chambers testified he admitted to something he didn't do because Olinger told him he would be found guilty because his DNA incriminated him. (Mot. 95). Chambers then responded to his counsel's questions as follows:
 {¶ 24} "Q. Did he promise you anything else if you would admit to doing something that you didn't do?
 {¶ 25} "A. I wouldn't say he promised me, but he did state that if I did cooperate at this time — it was about five or six questions, the same questions being presented to me — he did state that if I did cooperate, that, like I said in my statements, I would be able to leave. And also by hand gestures, that if I did cooperate, I would have a lesser sentence.
 {¶ 26} "Q. Did he threaten you with anything if you did not admit these accusations about molesting the little girl?
 {¶ 27} "A. He stated that — he looked at my body size, he took a glance at my body, and of course I am a small individual. He looked at me and said I wouldn't make it in prison, that if I didn't cooperate, that's where I would end up eventually.
 {¶ 28} "Q. What did you understand to be meant by cooperate?
 {¶ 29} "A. Basically doing what they wanted me to do, telling them what they wanted to hear, that I was guilty of this crime, as far as they kept presenting me these questions and I was under the assumption that I wasn't cooperating. So when I kept telling them — I kept answering these questions, he would present me to a — he would present me the same question several times like telling me I wasn't cooperating.
 {¶ 30} "Q. Did you tell him you didn't want to talk any more at any point?
 {¶ 31} "A. Yes, I did. I stated several times in my statements that I was done cooperating — I was done speaking with him, telling him thank you for his time.
 {¶ 32} "Q. So when you wrote `thank you for your time,' which I think is in Exhibit No. 2 or 4 —
 {¶ 33} "A. That I was done with the interview.
 {¶ 34} "Q. What did he say to that?
 {¶ 35} "A. He kept presenting me with these questions. He was asking me to basically say that if I help him, he would help me.
 {¶ 36} "Q. Did you think you had the right to remain silent then?
 {¶ 37} "A. No."
 {¶ 38} Finally Chambers testified as follows on direct examinations:
 {¶ 39} "Q. Did he promise or threaten you with anything if you did not admit the truth of his statements?
 {¶ 40} "A. That eventually I would go to prison for a long period of time, due to his hand gestures.
 {¶ 41} "Q. If you did not admit that.
 {¶ 42} "A. Yes."
 {¶ 43} (Mot. 98).
 {¶ 44} Lastly, Chambers testified that he suffered a broken jaw a few months before he was arrested and it bothered him during the interview. He admitted he did not tell Detective Olinger about his discomfort. (Mot. 108).
 {¶ 45} In overruling Chambers' motion to suppress, the trial court found that the police fully complied with the Miranda
requirements. The Court further stated in its decision:
 {¶ 46} "Compliance with Miranda requirements is evidence of voluntariness, but is not necessarily dispositive of the issue. In order to show involuntariness, the Defendant must show that his will to remain silent was so overborne as to vitiate the trustworthiness of his inculpatory statements. State v. Harvill
(1984), 15 Ohio App. 3d 94. Even if the Court were to have found that there had been a misrepresentation concerning DNA evidence, this would only be a factor bearing on voluntariness, but would not establish coercion or involuntariness on its own. State v.Whiles (1991), 59 Ohio St. 3d 71, cert. denied 506 U.S. 832
(1992).
 {¶ 47} "For example, promises or representations that a Defendant's cooperation will be considered in disposition of the case, or that a confession will be helpful, do not invalidate an otherwise legal confession. State v. Wilson (1996),117 Ohio App. 3d 290, 294."
 {¶ 48} The trial court then concluded that Chambers' statements were voluntarily made after he knowingly and intelligently waived his constitutional rights.
 {¶ 49} In determining whether a pretrial statement is voluntary, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." Statev. Edwards (1976), 49 Ohio St.2d 31, 3 O.O.3d 18,358 N.E. 2d 1051, paragraph two of the syllabus. Under the totality of the circumstances, and for the reasons that follow, we conclude that appellant made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his confession to police was voluntarily made.
 {¶ 50} Chambers was twenty-three years old at the time of the interrogation. He had prior experience with the criminal and juvenile justice system. He had thirteen years of schooling. Although the interview took place for three and one-half hours from start to finish, Chambers was accorded several breaks and he was given an opportunity to write four separate statements. There was absolutely no evidence of physical deprivation or mistreatment, and although Chambers stated he was feeling some discomfort from a broken jaw he suffered a few months prior to the interview, he admitted he expressed no discomfort to the police officer interviewing him. The trial court did not find that Detective Olinger told Chambers that the police had DNA evidence and Olinger testified only that the police might have DNA evidence which could link Chambers to the crime.
 {¶ 51} Although the trial court did not expressly state in its decision that it believed Olinger did not promise leniency in the event Chambers confessed, the court implicitly found that Olinger merely represented to Chambers that his cooperation would at least be considered in the disposition of his case. In Statev. Bailey (Mar. 31, 1995), Miami App. No. 94CA39, we held that a statement by the police that the defendant "could help himself" by speaking with investigators was not impermissibly coercive because "the advice was non-specific how making a statement would be advantageous." Indeed, assurances by the police that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a resulting confession. Statev. Loza (1994), 71 Ohio St.3d 61, 67.
 {¶ 52} It is well established that at a suppression hearing, "the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." State v. Mills (1992),62 Ohio St.3d 357, 366, 582 N.E.2d 972, citing State v. Fanning (1982),1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583. The trial court was free to find the officers' testimony more credible than appellant's. We therefore defer to the trial court's ruling regarding the weight and credibility of witnesses. State v.Moore (1998), 81 Ohio St.3d 22, 31, 689 N.E.2d 1.
 {¶ 53} The appellant's second assignment of error is also Overruled.
 {¶ 54} In his third assignment, Chambers contends the trial court erred in sentencing him consecutively for his convictions of rape and felonious assault. Chambers challenges his sentence on two bases. First, Chambers argues that the trial court failed to state the proper findings and its reasons for ordering consecutive sentences pursuant to R.C. 2929.14(E)(4). Second, Chambers argues that his sentences for rape and felonious assault merge because they are allied offenses of similar import and committed with the same animus.
 {¶ 55} "[W]hen imposing consecutive sentences, a trial court must make its findings under R.C. 2929.14(E)(4) and give reasons supporting the findings under R.C. 2929.19(B)(2)(c) at the sentencing hearing." State v. Brooks, 103 Ohio St.3d 134,2004-Ohio-4746, at ¶ 14, citing State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus. The findings required include a finding that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C.2929.14(E)(4).
 {¶ 56} In addition to the required findings set forth above, R.C. 2929.14(E)(4) also requires a trial court to make an additional finding that one of the three following statutory factors also applies:
 {¶ 57} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, * * * or was under post-release control for a prior offense.
 {¶ 58} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 59} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 60} Chambers contends the trial court failed to make one of the three findings listed at R.C. 2929.14(E)(4). The trial court, however, did find that consecutive sentences are necessary to protect the public from future crime, and the trial court referred to Chambers' prior juvenile adjudication of gross sexual imposition. Consequently, the trial court made the required finding of R.C. 2929.14(E)(4)(c) and the requisite reason was provided to support that finding.
 {¶ 61} Chambers also argues that the trial court should have merged his felonious assault conviction with his rape conviction because they are allied offenses of a similar import. The State argues that Chambers waived this claim of error because he didn't make it in the trial court. The State argues that it isn't "plain error" either.
 {¶ 62} The allied-offense statute, R.C. 2941.25, provides:
 {¶ 63} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 64} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 65} "Under the analysis of State v. Rance (1999),85 Ohio St.3d 632, 710 N.E.2d 699, a reviewing court is to compare the elements of the offenses in the abstract. If the elements correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. Id. at 638-639 (citing State v. Jones
(1997), 78 Ohio St.3d 12, 14, 676 N.E.2d 80). This issue is whether `the elements of the crimes "correspond to such a degree that the commission of one crime will result in the commission of the other.'" If the elements do not so correspond, the crimes are not allied offenses of similar import. State v. Driver, (Oct. 23, 2000) Stark App. No. 1999CA00290.
 {¶ 66} Chambers was convicted of rape of a person under ten years old with serious physical harm in violation of R.C.2907.02, which prohibits any person from engaging "in sexual conduct with another who is not the spouse of the offender * * * and is less than thirteen years of age" or "when the offender purposely compels the other person to submit by force or threat of force." Chambers was also convicted of felonious assault in violation of R.C. 2903.11(A), which prohibits any person from knowingly causing serious physical harm or physical harm by means of a deadly weapon to another.
 {¶ 67} When compared in the abstract is it clear that the offenses of rape and felonious assault are not allied offenses of similar import. Rape need not involve a deadly weapon or serious physical harm and felonious assault need not involve sexual conduct. State v. Crawl (July 14, 2000), Montgomery App. No. 17995 (rape can be accomplished without the infliction of serious physical harm), citing State v. Jones (1992),83 Ohio App.3d 723, 615 N.E.2d 713. The appellant's third assignment of error is Overruled. The Judgment of the trial court is Affirmed.
Fain, J., and Valen, J., concur.
(Hon. Anthony Valen, Retired from the Twelfth Appellate District, Sitting by assignment of the Chief Justice of the Supreme Court of Ohio).