OPINION
This is a timely appeal from a jury verdict in the Court of Common Pleas, Carroll County, convicting Lee Pizzillo ("Appellant") of two counts of sexual battery in violation of R.C. § 2907.03(A)(5). The trial court thereafter imposed two consecutive five-year terms of imprisonment and designated Appellant a sexual predator in accordance with R.C. Chapter 2950.
This appeal raises five assignments of error. In light of this Court's decision to reverse and remand this case based on two of the issues Appellant has raised, however, it will not be necessary for this Court to address all of the issues in Appellant's brief.
As detailed in the discussion that follows, the record demonstrates that in deciding this matter, the jury was exposed to irrelevant, inadmissible and prejudicial evidence. First, a social worker was allowed to offer her opinion about the believability of the alleged victim on the ultimate issue to be decided. Second, another witness testified that Appellant had previously spent time in prison, even though the trial court had entered an order barring such testimony. Given that a review of the record in this matter reveals that the evidence of guilt in this case was not overwhelming, these errors cannot be characterized as harmless.
A grand jury charged Appellant with two counts of sexual battery in violation of R.C. § 2907.03(A)(5). The indictment alleged that on two occasions Appellant had committed acts of sexual battery on his then-minor stepdaughter ("the victim"). According to the state, the abuse first occurred sometime between July 4, 1997, and July 23, 1997, and continued until May 7, 2000. (Indictment, July 3, 2000; Tr. pp. 45-46).
The matter proceeded to jury trial on September 18, 2000.
The prosecution's case rested almost exclusively on the victim's account of the alleged sexual abuse. (Tr. p. 47). The victim testified that in April of 1997, Appellant moved into the Bowerston home she shared with her mother and the victim's two younger brothers. Eventually, Appellant's three young daughters also moved into the house. (Tr. p. 97). Early in July 1997, Appellant and the victim's mother were married. (Tr. pp. 78, 128).
The victim recounted that the abuse began that summer sometime before her sixteenth birthday. The first instance occurred on a night after July 4, 1997. (Tr. p. 81). That night, Appellant and the victim were alone in the living room after everyone else went to bed. The victim relayed that she had been lying on the love seat in her bathing suit when Appellant came over and removed the suit. The victim testified that she pretended to be asleep while Appellant put his fingers into her vagina and then attempted to force his penis into her mouth before she turned her face into the cushions. (Tr. p. 79).
The victim testified about a second incident that she said happened a few weeks later. By this time, she was living in a basement bedroom near the family laundry room. (Tr. pp. 80, 149). That night, she heard Appellant come down the stairs and walk toward the garage. She testified that she heard Appellant open and close the garage door and then enter her room. The victim testified that Appellant turned on the bathroom light, pulled the door to, and crawled into her bed. There, he removed her pajama bottoms and inserted first his fingers then his penis into her vagina. (Tr. p. 80).
The victim testified that she and Appellant had intercourse in her bedroom between two and four times a month over the next three years. (Tr. p. 82). The sexual encounters always happened in the dark. (Tr. p. 92). Typically, Appellant brought marijuana, which the two of them smoked beforehand. The victim recounted that the marijuana made her body numb, testifying: "I couldn't move, couldn't speak, couldn't do anything. My body was just, I couldn't move." (Tr. p. 82).
Although she could not provide specific dates on which these alleged instances of sexual abuse occurred, the victim did recall that the last time was May 7, 2000. (Tr. p. 83). The victim kept the abuse a secret until the end of May 2000, when she disclosed it to two of her friends. (Tr. p. 85).
Late in 1997, during an interview with child welfare workers, the victim denied that anything sexually inappropriate was going on at home and declared that she and her stepfather had a good relationship. (Tr. pp. 84, 96). At the time, she also denied that anyone in the household used drugs or alcohol. (Tr. p. 100).
On June 16, 2000, in an interview with the Department of Family and Job Services conducted at the high school that the victim attended, she again denied that any abuse had occurred. On June 22, 2000, however, she confided to her mother that Appellant had been sexually abusing her. (Tr. pp. 131-132). When her school principal and two social workers from the Department of Family and Job Services re-interviewed her a short time later, she recanted her previous denials and told them that Appellant had abused her. (Tr. pp. 177, 191). The record does not indicate what information precipitated this investigation or how the alleged abuse first came to the attention of the authorities.
Also testifying at trial on behalf of the prosecution was Rick Taff, an investigator from the Carroll County prosecutor's office. Investigator Taff recounted the victim's statements during his interviews with her on June 16, 2000, and June 22, 2000. (Tr. pp. 55-58). Taff also testified that during an interview on June 19, 2000, Appellant denied abusing his stepdaughter. (Tr. p. 57).
The prosecution's only other witness was the victim's mother, Jackie Pizzillo. Mrs. Pizzillo confirmed that on June 22, 2000, the victim informed her that Appellant had been sexually abusing her. At first, Mrs. Pizzillo believed the victim. (Tr. pp. 130-132). Based on the information the victim gave her, Mrs. Pizzillo reported the abuse to the authorities who then arrested Appellant for sexual battery. (Tr. p. 148). Mrs. Pizzillo testified that as time passed she began to harbor doubts about her daughter's story.
According to Mrs. Pizzillo, the victim's story did not add up. She claims that the victim's bedroom had been on the second floor until sometime after January of 1998, when Appellant obtained custody of his three young daughters. Only then, because the family needed the extra room, was the victim's room moved to the basement. Mrs. Pizzillo's recollection contradicted the victim's claim that the abuse, which ostensibly started in the summer of 1997, occurred in her basement bedroom. (Tr. pp. 149).
Mrs. Pizzillo also relayed a discussion she had with the victim involving a diary that the victim kept. After Appellant's arrest, Mrs. Pizzillo suggested that the victim give the diary to the prosecutor as additional proof of the abuse. Initially, the victim denied that she had ever referred to the abuse in the diary. (Tr. p. 155). But later, the victim told her mother that she had written about it but that Appellant had torn the pages that mentioned the abuse out of the journal. (Tr. p. 156).
Another reason for Mrs. Pizzillo's growing concern about the victim's allegations was the fact that she had never mentioned what Mrs. Pizzillo considered to be an obvious deformity in her husband's penis. According to Mrs. Pizzillo, Appellant's penis was hooked in such a manner that anyone on intimate terms with him to the extent that the victim claimed would have detected it. Yet, the victim had never spoken of such a deformity and when Mrs. Pizzillo questioned her about it, the victim told her she had not noticed a deformity. (Tr. p. 141).
Mrs. Pizzillo testified that her skepticism mounted over time, forcing her to conclude that the victim was not telling the truth about what had occurred. Other factors troubled Mrs. Pizzillo. For example, she caught the victim lying in the past; the victim expressed no emotion when she first told her mother about the abuse; Appellant did laundry infrequently during the three years that the victim said he was regularly visiting her in the basement; and Mrs. Pizzillo said she never smelled marijuana in the house. (Tr. pp. 141-147).
After Mrs. Pizzillo testified, the state rested. The defense called Ms. Bridget Cross, a social worker for the Department of Jobs and Family Services ("Ms. Cross"), who confirmed that the victim had initially denied allegations of sexual abuse or impropriety. On cross-examination, however, the witness testified that she believed that the victim was lying when she denied the abuse. (Tr. pp. 183-184). This witness also testified, albeit vaguely, that the family had been involved with her department in the past. (Tr. p. 188).
Appellant also called another social worker investigating the allegations of sexual abuse and marijuana use in Appellant's home. This witness confirmed that during an interview she participated in with Appellant on June 19, 2000, he denied using marijuana and volunteered to take a drug test. The test, a urine test which was administered the next day, proved negative for the presence of marijuana. (Tr. pp. 197-200). The witness testified, however, that the alleged abuse and marijuana use had occurred on May 7, 2000, 43 days before the test was administered. According to this witness, traces of marijuana typically remain in the urine only for 30 days. Therefore a negative result from a test taken 44 days after the alleged use would not necessarily rule out its use. (Tr. p. 204).
The last defense witness was Allen Kennedy, the victim's high school principal, who was also present during the victim's June 16, 2000, interview during which she denied that anything sexually inappropriate was occurring at home. Principal Kennedy relayed that he knew the victim and that she seemed her normal self during that interview. (Tr. p. 226).
The jury deliberated for several hours over two days. In the end the jury found Appellant guilty of both counts in the indictment. (Tr. pp. 272-274). On September 26, 2000, the trial court imposed consecutive sentences of five years on each count and entered an order finding that Appellant was to register as a sexual predator under R.C. Chapter 2950.
Appellant filed his notice of appeal on October 19, 2000. In his appeal to this Court, Appellant states five assignments of error. Appellant's second and third assignments of error are dispositive of this appeal and render some issues moot. In an effort to address Appellant's claims in the most expeditious and coherent manner possible, Appellant's assignments of error will be taken out of turn.
This Court will address Appellant's fourth assignment of error first. Here, Appellant argues that,
 "THE TRIAL COURT ERRED BY NOT ALLOWING APPELLANT PIZZILLO TO OFFER A VIDEO TAPE SHOWING HIS INTERACTION WITH THE VICTIM IN VIOLATION OF MR. PIZZILLO'S RIGHT TO DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (TR. AT 139-40)."
Because this issue will undoubtedly resurface in the event of a retrial, we will resolve this issue first. Appellant maintains that the trial court erred when it barred him from showing a videotape depicting Appellant and the victim interacting with each other and the rest of the family. Appellant argues that the videotape was taken during the time that the abuse was alleged to have taken place and the victim's behavior in the tape reflected that she and Appellant had a normal relationship. Appellant argues that the tape diminishes the credibility of the victim's allegations. Accordingly, when the trial court barred him from introducing the videotape, it substantially impaired his ability to present a defense.
The admission or exclusion of relevant evidence rests with the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180. Reviewing courts are slow to interfere with a court's determination concerning the admissibility of evidence unless the trial court has clearly abused its discretion and the party challenging its admission has been materially prejudiced by it. State v. Maurer (1984),15 Ohio St.3d 239, 265.
Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401; State v. Mann (1985), 19 Ohio St.3d 34, 39. Accordingly, with some exceptions, where videotape evidence is relevant to an issue in a case, it should be admissible. In Mann, the Ohio Supreme Court held that a videotape of the events leading up to the defendant's arrest was relevant to the defense on the charge of resisting arrest. Id. at 38. The court held that the videotape tended to show that the defendant was not resisting arrest and, in fact, it supported defendant's claim that the police had engaged in misconduct. Consequently, the court concluded that the tape was both supportive of defense testimony and helpful in refuting the prosecution's case. Id. at 39.
In the case before us, Appellant attempted to introduce the videotape at the beginning of his cross-examination of the victim's mother. The tape depicted Appellant, the victim and other family members apparently interacting happily during two family holidays that fell within the time frame the alleged abuse occurred. (Tr. pp. 139-140). Appellant argued that the normal relationship between Appellant and the victim reflected in the videotape rebuts the victim's claims that abuse occurred.
Appellant failed to show how this evidence, which offers no more than a mere snapshot of the relationship between Appellant and the victim at that moment, would impugn the credibility of the victim's allegations or undermine the state's theory of the case. Without this demonstration, we cannot say that the trial court abused its discretion in barring the introduction of the tape. The trial court is well within its discretion to exclude evidence that it deems cumulative or irrelevant. Therefore, Appellant's fourth assignment of error is overruled.
In his second assignment of error, Appellant contends,
 "THE TRIAL COURT ERRED BY ALLOWING A SOCIAL WORKER TO TESTIFY THAT SHE BELIEVED THE COMPLAINING WITNESS WAS A VICTIM OF SEXUAL ABUSE IN VIOLATION OF MR. PIZZILLO'S RIGHT TO DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (TR. AT 188-92; 233-35)."
Appellant contends that he is entitled to a new trial because the prosecution improperly elicited testimony from Ms. Cross that the victim was lying during her June 16, 2000, interview in which she denied that her stepfather abused her.
Appellant urges that Ms. Cross's testimony was inadmissible for two reasons. First, under State v. Boston (1989), 46 Ohio St.3d 108, andState v. Stowers (1998), 81 Ohio St.3d 260, although a child abuse expert may testify about the symptoms of child sexual abuse syndrome, the witness may not offer her opinion about the credibility of the allegations. Second, even if Ms. Cross's opinions had been admissible, she was barred from offering them because she was not qualified as a child abuse expert.
Based on the record as a whole, we find that this assignment of error has merit. This evidence was completely inadmissible as it touched on a critical issue in this case and, given its prejudicial impact, justifies a new trial.
The trial court's rulings with respect to the admission or exclusion of evidence are typically discretionary. This Court will not disturb such rulings absent a showing that the trial court abused its discretion thereby causing material prejudice to the defendant. State v. Martin
(1985), 19 Ohio St.3d 122, 129.
It is reversible error to admit testimony from a purported expert or lay witness attesting to the believability of another's statements.Boston, supra, at 128. In Boston, the defendant challenged the testimony of a child psychologist, who opined that the alleged victim had neither fantasized her abuse nor been programmed to make the accusations. The Ohio Supreme Court observed that in so testifying, the witness had effectively declared that the victim was truthful.
In reversing the conviction in Boston, the Court stressed that in our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses. Id. at 129, citing State v. Eastham (1988),39 Ohio St.3d 307, 312 (Brown, J. concurring). The Court concluded that the admission of this testimony was not only improper, it was highly prejudicial and constituted reversible error. Id.
More recently, the Ohio Supreme Court held that a witness qualified as an expert in the area of child abuse could testify that the alleged victim displayed symptoms consistent with having been sexually abused, inStowers, supra. In doing so, though, the court revisited and reaffirmed the rule it set out in Boston excluding witnesses from offering opinions regarding the believability of the allegations themselves. Stowers,supra, at 262-263.
The testimony at issue in the case at bar was elicited by the prosecution during its cross-examination of Ms. Cross who had interviewed the victim about the alleged abuse on June 16, 2000, and then again, on June 22, 2000. On direct examination, Ms. Cross testified that during the first interview, the victim denied the abuse. Later, during the second, she admitted she was abused. The prosecutor's cross-examination of Ms. Cross proceeded as follows:
 "Q. On June 16th, 2000, you went to the school of [the victim] to interview her, is that correct, one of your purposes?
"A. Yes.
"Q. In fact [the victim] told you there was no inappropriate sexual conduct in the home, is that correct?
"A. Right.
"Q. Yet you made arrangements on the 16th, when she failed to disclose, to interview other peers and continue her investigation, is that correct?
"A. Right.
"Q. And isn't it a fact based upon your 10 years experience, your training, education, experience, that you did not believe that she was telling you the truth on June 16th, 2000 when you were questioning her whether or not she was being sexual (sic) abused?
"A. Right.
"Q. Can you tell the members of the jury why you knew [the victim] was lying to you during your interview on June 16th, 2000?" (Tr. pp. 183-184).
Ms. Cross then went on to explain how she managed to divine that the victim had been lying on June 16, 2000:
"A. [The victim] was very difficult. She uh, her body language. She turned her back to me most of the time. Uh she was silent on a lot of the questions that I asked. Uh she was figidity. (sic) She just wanted me outa there, uh and eye contact was just awful. It was down. Uh never wanted to look at me. Just very angry that I was there and I knew by that she knew something, something was happening to her that she wanted to tell but she wanted me outa there because I was pressing." (Tr. p. 184).
 While her ten years as a social worker may have allowed Ms. Cross to develop many skills, mind reading is not one of them. This testimony is patently inadmissible and is prohibited under Boston andStowers.
Efforts to elicit witness testimony vouching for the credibility of sexual abuse victims have met repeatedly with reversal. In State v. Coffman (1998),130 Ohio App.3d 467, the reviewing court found that testimony from a detective that child abuse victims, at least those of that victim's age, always tell the truth, was absolutely improper. Id. at 473.
Another reviewing court reached the same conclusion about similar evidence in State v. Phillips (January 29, 1999), Shelby App. No. 17-98-8, unreported. There, the jury was allowed to view reports wherein an examining expert discussed the credibility of the victim's sexual abuse allegations. Although the objectionable information had been redacted with a magic marker, these had been performed inadequately and anyone reading the reports could make out the objectionable remarks. Id. at p. 3. The court concluded that this, in conjunction with other errors, warranted a new trial.
There is no dispute in the instant matter that the prosecution's entire case rested on the statements and testimony elicited from the victim. Accordingly, the jury had to decide the case based on its assessment of the victim's credibility. Whether or not the victim was telling the truth about the abuse was the ultimate determining factor in this case. Ms. Cross's testimony that the victim had been lying when she denied the abuse (and, by implication, was telling the truth when she admitted it), subverted the function of the jury and improperly bolstered the victim's credibility.
Appellee counters that the prosecutor's questions eliciting Ms. Cross's inadmissible testimony was invited by questions asked of this witness by defense counsel on cross examination.
According to Appellee, defense counsel "opened the door" to the inadmissible opinion testimony with the following series of questions:
"Q. You've investigated many claims of this nature before?
"A. Right.
"Q. Is that correct?
"A. Right.
"Q. Uh you found to be in the past, for all the allegations that are made out there, are they invariably true?" (Tr. p. 176).
These are general questions probing Ms. Cross's investigation of allegations of sexual abuse, however. They clearly do not seek inadmissible information about the credibility of the victim's allegations.
Appellee also points to additional questions which purport to open the door to questions about the credibility of the victim's allegations:
"Q. Didn't she tell you at some point during your interview process with her, that he used some form of narcotic to render her, not her term, but to render her defenseless. Did she tell you anything like that?
"A. Yes.
"Q. Did you find that believable?" (Tr. p. 182).
The rest of the testimony, however, demonstrates that trial counsel's questions were directed at the feasibility of the victim's claims that the marijuana she ingested before having sex immobilized her. (Tr. pp. 82, 182). Whether or not the victim was induced to smoke marijuana was not the issue to be decided by the jury. This was merely a tangential factor in the victim's story.
Appellee here obviously misconstrues the notion of invited error. Generally, the invited error rule will bar a party from obtaining relief based upon an error which that party caused. In other words, had defense counsel in the instant case attempted to elicit from Ms. Cross her views on the victim's believability, any error or prejudice enuring from those questions and her responses would be attributed to the defense and therefore probably invited. See accord, State v.Chappell (1994), 97 Ohio App.3d 515, 537; and State v.Netherland (1999), 132 Ohio App.3d 252, 258-259.
In the case sub judice, however, the inadmissible testimony was elicited by the prosecution. Neither of the lines of inquiry employed by the defense invited the type of inadmissible questions that the prosecutor asked of Ms. Cross at trial.
In framing his challenge to the admissibility of Ms. Cross's testimony, Appellant admits that he may have waived raising this issue as error on appeal because trial counsel failed to object to the testimony at the time of trial. Traditionally, the failure to interpose timely objections to evidence will constitute a waiver of those objections. State v. Douse (2000),140 Ohio App.3d 42, 47. Appellant is correct that trial counsel failed to interpose a contemporaneous objection to Cross's testimony about the believability of the victim's allegations.
 Nevertheless, a reviewing court may consider plain errors or defects which affect substantial rights even where they were not brought to the attention of the trial court. Crim.R. 52(B); State v. Demiduk (June 24, 1998), Columbiana App. No. 96-C0-16, unreported, citingState v. Walker (1981), 2 Ohio App.3d 483. Plain error is defined as, "obvious error which is prejudicial to an accused, although neither objected to nor affirmatively waived, which, if allowed to stand, would have a substantial adverse impact on the integrity of and public confidence in judicial proceedings." State v.Craft (1977), 52 Ohio App.2d 1, 7. A review of the record on this issue indicates that plain error occurred.
Appellant was charged with the offense of sexual battery. The prosecution proves such an offense when it demonstrates that the offender engaged in sexual conduct and, "the offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. § 2907.03 (A)(5). There was no dispute below that Appellant was the victim's stepfather. Therefore, the only element at issue here was whether the sexual conduct occurred.
The evidence of sexual conduct came entirely from the victim. As both parties noted in their respective opening statements, the case turned on the victim's credibility. In fact, the victim's various statements concerning the incident are the only real evidence the prosecution offered. While other witnesses did testify, they merely repeated what the victim told them about the abuse. The record reflects that the victim's account was contradicted several times and that her credibility was less than stellar.
The record reveals that the jury had difficulty deciding this case. The jury's deliberations were lengthy, given the brevity of the trial. (Tr. pp. 267-272). The jury's request for a transcript of the victim's testimony demonstrated its recognition that the case depended on the victim's accounts of abuse. (Tr. p. 267). The jury submitted the following question to the court during deliberations:
 "Must we be convinced that the sexual contact/intercourse occurred exactly as described by [the victim], or, if we are convinced that some kind of sexual contact occurred, is that sufficient?" (Tr. p. 270).
This question indicates that one or more of the jurors may have been skeptical about the victim's account of what occurred.
Given the overall sparsity of the evidence, it is quite possible that but for the fact that Ms. Cross improperly vouched for the victim's veracity, the jury would have entered an acquittal. Ms. Cross's improper credibility assessment could very well have made the difference between the trier of fact's decision to convict or acquit in this case. Accordingly, we are forced to conclude that the admission of such evidence was plain error, requiring us to reverse and order a new trial be held.
In his third assignment of error, Appellant contends,
 "THE TRIAL COURT ERRED BY FAILING TO GRANT A MISTRIAL IMMEDIATELY AFTER THE COMPLAINING WITNESS TESTIFIED THAT APPELLANT PIZZILLO HAD PREVIOUSLY BEEN IN PRISON, IN VIOLATION OF MR. PIZZILLO'S RIGHT TO DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (TR. AT 86-87)."
Appellant maintains that the trial court should have granted a mistrial when the victim testified about an argument she and the Appellant had during which he stated that he would not go back to prison. Prior to trial the court barred the prosecution from referring to Appellant's criminal history unless Appellant decided to testify. (Tr. pp. 41-43). Appellant argues that when the prosecutor elicited testimony from the victim that he had previously served time in prison, it violated the Court's order and irreparably prejudiced the jury, thus affecting the outcome of the trial.
The decision to grant or deny a mistrial rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Crim.R. 33; Sage, supra, 31 Ohio St.3d at 182. An abuse of discretion, "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." State v. Jackson (March 28, 2001), Belmont App. No. 99-BA-9, unreported citing State v. Adams (1980), 62 Ohio St.2d 151,157.
Granting a mistrial is an extreme remedy which is only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice. State v. Jones (1992), 83 Ohio App.3d 723,737. Mistrial is not properly granted, "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." State v. Lukens (1990),66 Ohio App.3d 794, 809.
In the instant case, the testimony at issue was elicited by the prosecution during its direct examination of the victim. The prosecutor asked the victim to relay a conversation that the victim had with Appellant sometime in May or June of 2000, before Appellant's arrest:
"Q. Did you have the occasion to have a conversation with the defendant Lee Pizzillo concerning the relationship between you and him?
"A. Yes.
"* * *
"Q. And do you recall what conversation you had * * * with your step-father?
"A. Yea. Uh he had found a notebook, and it had said in it, `cause I had wrote a letter to my boyfriend shortly at the time, but I had told him, my best friend Ed, uh I came upstairs to look at a date on the calendar and I saw the notebook, so I turned around and went back downstairs and he came down and he said that I can't be tellin' anybody. * * * Uh he said that if caseworkers came knocking on the door that he was gonna deny it completely, up and down, and that if he had gone back to prison that would be his fault, and that it would be his fault that his girls did not grow up — " (Tr. pp. 85-86).
At that point, defense counsel approached the bench and sought a mistrial. The trial court summarily denied the motion.
The victim's testimony revealed to the jury that Appellant had previously been in prison. Whether or not the testimony warranted a mistrial, at a minimum the trial court should have sustained an objection to the testimony itself and taken some kind of action to ameliorate the damage such testimony can cause. See, Jones, supra,83 Ohio App.3d at 737, citing State v. Hector (1969), 19 Ohio St.2d 167 (reference to prior arrests of the defendant is prohibited). The trial court did nothing, however. Not only did the trial court deny the motion for a mistrial, it refused to strike the testimony, gave no curative instruction and overruled defense counsel's objection. (Tr. p. 87). Accordingly, in deciding whether or not Appellant was guilty of engaging in sexual intercourse with his teenage stepdaughter, the jury was allowed to speculate about Appellant's criminal past.
This Court is not prepared to say that the victim's improper reference to Appellant's past so damaged the fairness of the proceedings to warrant, in and of itself, a mistrial. State v. Garner (1995),74 Ohio St.3d 49, 59. The reference to Appellant's previous prison experience was brief and the prosecutor did not highlight the information or return to it at any subsequent point in the trial. See, State v.Patterson (May 22, 1998), Trumbull App. No. 96-T-5439, unreported (testimony alluding to time the accused previously spent in jail did not warrant a mistrial where reference was fleeting, isolated and the trial court gave the jury clear and unequivocal instructions to disregard the statement).
Nevertheless, we note that in the majority of cases where the reviewing court concluded that the error or impropriety did not necessitate a mistrial, the court so ruled because the trial court had sustained the objection to the evidence and had given the jury a curative instruction. See, e.g., State v. Jones (1996), 115 Ohio App.3d 204; and State v.Jackson (March 28, 2001), Belmont App. No. 99-BA-9, unreported. The efficacy of such curative instructions is presumed. State v. Nichols
(1993), 85 Ohio App.3d 65, 69. Undoubtedly, such an instruction was necessary in the instant case.
The trial court's failure to sustain Appellant's objection to the testimony at issue here and instruct the jury accordingly was not harmless error, given the limitations of the prosecution's case discussed previously herein. Accordingly, Appellant's third assignment of error has merit.
In light of this Court's decision to reverse this case and remand the matter for a new trial, Appellant's fifth assignment of error, challenging the trial court's denial of his request for a continuance, is rendered moot. Appellant's first assignment of error challenging the manifest weight of the evidence against him is similarly rendered moot.
In light of the foregoing discussion, Appellant's conviction and sentence are reversed and vacated and this matter is remanded for a new trial.
Donofrio, J., concurs.
DeGenaro, J., concurs.