[Cite as *State v. Rivers*, 2023-Ohio-3533.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

MICHAEL A. RIVERS,

        Defendant-Appellant.

CASE NO. 2023-T-0001

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00292

**O P I N I O N**

Decided: September 29, 2023
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Richard E. Hackerd*, 55 Public Square, Suite 2100, Cleveland, OH 44113 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Michael A. Rivers, appeals the judgment sentencing him to an aggregate of 14 to 18 years of imprisonment after a jury found him guilty of one count of aggravated burglary with two attendant firearm specifications and two counts of having weapons while under disability. We affirm.

{¶2} In 2020, Rivers was indicted on one count of aggravated burglary, a first-degree felony, in violation of R.C. 2911.11(A)(2) and (B), together with two firearm

specifications pursuant to 2941.145, and two counts of having weapons while under disability, third-degree felonies, in violation of R.C. 2923.13(A)(2)(3) and (B).

{¶3} Rivers pleaded not guilty. During the proceedings, defense counsel moved to withdraw on the basis that Rivers wished to proceed pro se. Following a hearing on Rivers' waiver of his right to counsel, the trial court found Rivers' waiver to be knowing, intelligent, and voluntary. The court permitted Rivers to proceed pro se and appointed prior defense counsel as stand-by counsel.

{¶4} After hearing and ruling on certain pretrial motions, the case proceeded to jury trial. At trial, the state presented the testimony of the victims and of police officers. One victim, H.W., testified that she and Rivers had been in an on-and-off relationship for many years, and they share a young child. In March 2020, Rivers was at H.W.'s home nearly every day as they tried to work on their relationship. Rivers would co-parent their child and perform chores at H.W.'s home, and he left clothes, shoes, and personal items there. However, Rivers was not listed on the lease with H.W., did not have any furniture at the home, and did not contribute to the bills at the home.

{¶5} On March 25, 2020, H.W. ended her and Rivers' relationship by sending a text message to Rivers, who was not at her home at that time, saying that she could not "do it," and she gathered Rivers' belongings in a bag and left the bag on the porch of Rivers' mother's residence. At that point, H.W. was interested in pursuing a relationship with A.R., a woman with whom she was involved when Rivers had previously been incarcerated.

{¶6} H.W. and A.R. testified that, later that evening, they were at H.W.'s home, along with a friend of H.W., and H.W.'s and Rivers' two-year-old child. The women played

2

a board game, and then H.W. and A.R. went to bed in H.W.'s bedroom, the child went to sleep in her own bedroom, and the friend fell asleep on H.W.'s couch. At approximately 4:00 a.m., A.R. woke H.W, saying she heard a noise in the residence. H.W. turned on the light, and they saw that Rivers was at the foot of the bed holding two guns, one of which belonged to H.W. and the other to A.R. Along with one of the guns, Rivers was holding H.W.'s and A.R.'s phones in one hand. Rivers told the women that he had all of their "shit."

{¶7} H.W. testified that Rivers had the guns positioned with the barrels pointed so that he could pull the trigger if he chose, but his fingers were not on the triggers. H.W. was afraid, but she did not believe that Rivers would use the guns. H.W. yelled for her friend, and she and Rivers left the bedroom and went to the couch, where the friend had been sleeping. Rivers demanded the friend's phone, and they returned to the bedroom.

{¶8} A.R. testified that, when H.W. and Rivers left the room, she called 9-1-1 from her second cell phone that was on the nightstand. H.W. testified that, when she and Rivers returned to the bedroom, Rivers pleaded with A.R. to hang up, but A.R. remained on the call.

{¶9} H.W. maintained that, when the police arrived, Rivers placed the guns and phones on H.W.'s bed and walked down the hallway. A responding officer testified that when he arrived at the residence, the women met him at the door, and the officer secured their handguns in his cruiser. Officers then escorted H.W. into the home to remove the child. After the child was removed, officers called three times for anyone in the residence to come out. When Rivers did not exit, the officers commenced a search of the house. The officers apprehended Rivers, who was located standing in the child's bedroom closet.

3

Case No. 2023-T-0001

{¶10} H.W. further maintained that, although Rivers had at one time possessed a key to her residence, as of March 26, 2020, he no longer had the key. Further, because the house was locked, H.W. indicated that Rivers could have gained entry only through a window in her computer room which had a broken latch and no screen, and she maintained that Rivers was aware of the condition of that window from the time he had spent at H.W.'s residence. H.W. identified an exhibit as depicting a picture of the window, with what appears to be mud and dirt on the exterior paneling of the home underneath the window ledge. H.W. testified that the mud was not on the house under that window prior to the day at issue, and she stated that it had been raining on the evening of March 25, 2020. H.W. also testified that Rivers told her during a later telephone call that he had used that window to enter her home that evening.

{¶11} Last, the state called an officer to testify that he had conducted operability tests on the two guns, both of which he determined to be operable. Thereafter, the state marked as exhibits certified copies of one prior felony domestic violence conviction and five prior felony drug convictions for purposes of demonstrating Rivers' disability to possess firearms. The state then rested subject to admission of its exhibits, all of which were admitted.

{¶12} As part of the defense's case, Rivers called his aunt to testify. The aunt maintained that Rivers used her home for an address for probation, but he did not stay there often. She maintained that Rivers stayed with H.W., and H.W. would bring Rivers to the aunt's home to contact his probation officer. On cross-examination, the state asked the aunt if Rivers was on parole, as opposed to probation, because he had just been released from prison approximately a month prior, and the aunt affirmed this was

4

accurate. The aunt also stated that Rivers was living with her, but H.W. would always come to pick up Rivers.

{¶13} Rivers also called his brother as a witness. The brother testified that Rivers lived with H.W. and used their aunt's address for his "PO." On cross-examination, the brother acknowledged that Rivers was lying to his parole officer regarding his address.

{¶14} Last, Rivers testified in a narrative form that, at the time of the incident, he was using his aunt's address for probation reporting, but each day he would go to H.W.'s home. He maintained that he was on probation, not parole, and each day he would travel to his aunt's house by 9:00 a.m. to call his probation officer. He and H.W. would then go back to H.W.'s house.

{¶15} Rivers maintained that, on the day before the incident, he called H.W. about their plans for that evening, and Rivers suggested to H.W. that they stay over at his mother's house with their child. He also asked H.W. to bring some clothes and half of his sneakers with her when she drove to see him with the child so that he could leave them at his aunt's house in case the probation officer came into the house. Rivers then went to his brother's girlfriend's house and informed H.W. he was there. H.W. replied that she was on her way. However, Rivers' mother later called Rivers and said that some of his things were there. Rivers asked if the child was there, and she responded in the negative. Rivers then went to his mother's house and called H.W. asking what happened. She replied that A.R. asked to see the child. She further stated that she would not be back for about three days because of COVID. Rivers responded that he would be "out there later," and hung up.

Case No. 2023-T-0001

{¶16} Rivers maintained that, when he obtained a ride that evening to H.W.'s house, he was somewhat intoxicated, and he saw A.R.'s car in the driveway. He sat on the neighbor's porch for some time and then decided to enter H.W.'s house with the key to the house that he had in his possession. When he entered, the women were sleeping, and he planned to wake A.R. to tell her about his and H.W.'s relationship. However, he first looked through H.W.'s phone to "see what's been going on." He saw the mention of guns on the phone, and he decided to obtain the women's guns before waking them. He located A.R.'s gun in the pocket of a hooded sweatshirt, and he retrieved H.W.'s gun from a shelf where she kept it.

{¶17} As Rivers then looked again at the phone, A.R. woke up and shook H.W. awake. Rivers turned on the light, and at that time had the guns in his pocket. He noticed A.R. look at the hooded sweatshirt where her gun had been located. Rivers pulled out the gun, but he did not point it in any type of threatening way. H.W. began yelling for her friend that was sleeping on the couch, and she and Rivers then went to speak to the friend. At this point, Rivers did not have the guns in his hands. He asked the friend to come in the back to talk, and she followed them to H.W.'s bedroom. When they stepped in the room, Rivers observed A.R. on another cell phone. At that point, Rivers stated that "we kind of like tried to get her -- we trying to tell her to chill out, like it's not that serious, whatever[.]" Rivers then took H.W.'s gun out of his pocket and handed it to her, and he sat A.R.'s gun on the bed in front of A.R. He confirmed that he was standing in the child's bedroom when police arrived.

6

**{¶18}** Rivers further testified that he did not break into the home through the window, that he and H.W. were in a relationship, and that he was "confused" by the testimony pertaining to the text message that was sent to him breaking off the relationship.

**{¶19}** On cross-examination, Rivers acknowledged that he had been convicted of six felonies. The state asked Rivers if he had absconded during this case and was "on the run for 10 months," to which Rivers responded "[s]omething like that." The state further asked Rivers if any key to the residence was found on him when he was booked into the jail. He maintained that the key was in his wallet, and the officers did not find it.

**{¶20}** Following deliberations, the jury found Rivers guilty of all counts and the specifications. The trial court ordered a presentence investigation and report and scheduled the matter for sentencing.

**{¶21}** At sentencing, the court imposed an indefinite prison term of 8 to 12 years on the aggravated burglary count, a prison term of 3 years on the first firearm specification, and a prison term of 3 years on the second firearm specification, with both firearm specifications to be served consecutively to each other and prior to and consecutive to the aggravated burglary sentence. On agreement by the state, the court merged the two counts of having weapons while under disability for sentencing, and the state elected to proceed to sentencing on the charge contained in count two of the indictment. On this count, the court sentenced Rivers to a prison term of 36 months to be served concurrently with the aggravated burglary sentence, resulting in a total sentence of 14 to 18 years of imprisonment.

**{¶22}** In his first assigned error, Rivers argues:

7

{¶23} "The Prosecutor engaged in misconduct that rendered Rivers' Trial unfair by repeatedly leading his own witnesses on direct and conversely interrupting and criticizing Rivers as Rivers attempted to conduct his case and develop his evidence."

{¶24} "To evaluate a claim of prosecutorial misconduct, we must determine whether the challenged conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 99, citing *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. "The benchmark of the prosecutorial-misconduct analysis is '"the fairness of the trial, not the culpability of the prosecutor."'" *Obermiller* at ¶ 99, quoting *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 135, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶25} Rivers first maintains that the state engaged in prosecutorial misconduct by repeatedly leading witnesses on direct examination. "A leading question is 'one that suggests to the witness the answer desired by the examiner.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, quoting 1 McCormick, Evidence, 19, Section 6 (5th Ed.1999). Pursuant to Evid.R. 611(C), with certain exceptions, "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." "[T]he trial court has discretion to allow leading questions on direct examination." *Diar* at ¶ 149, quoting *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 138; *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993).

{¶26} Rivers did not object to the leading questions that he now challenges. Accordingly, he has forfeited all argument relative to the questions aside from plain error.

Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." (Citation omitted.) *Obermiller* at ¶ 62. The requirement that the error must have affected substantial rights means that the error must have affected the outcome of trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "We take '[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Obermiller* at ¶ 62, quoting *State v. Long,* 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶27} Here, Rivers first challenges the following emphasized questions asked of H.W. during her direct testimony:

> Q     So you said you wake up and he's holding the guns. Are they loaded at that time?
>
> A     Yes.
>
> Q     How is he holding them?
>
> A     Just with -- in his hands like this (indicating).
>
> Q     So he's holding the guns like this (indicating)?
>
> A     Yes.
>
> Q     Right?  *With the barrels pointing so he could pull the trigger if necessary or if he chose to, right?*
>
> A     Yeah.  Well, his fingers weren't on the trigger, but yeah.
>
> * * *
>
> Q     Okay.  Does he threaten you at any point?
>
> A     No.

Case No. 2023-T-0001

Q     Okay.  And to his credit*, he doesn't put those guns to your head* or, you know --

A     No.

Q     -- hold you hostage --

A     No.

Q     -- for hours on end or something, right?

A     (Shaking head negatively.)

Q     *Were you scared* when you first woke up and he's holding two guns at the foot of your bed?

A     I was scared because I woke up and he was in there, but I didn't think he was going to use them.

Q     I understand that.  You have, would you agree -- would you agree that *your relationship and his relationship is problematic* in many ways?

A     Yes.

* * *

Q     Okay.  *Did he also admit to you later in jail calls* that he came in that window?

A     Yes.

* * *

Q     Sure.  *You would agree that most people who live in a place use the door to enter*, is that correct?

A     Yeah.

* * *

Q     And your two-year-old is sleeping while all this is going on, right?

A     Yes.

10

Case No. 2023-T-0001

> Q    *Does that give you some cause for concern, I would imagine?*
>
> A    Yes.

(Emphasis added.)

{¶28} Although Rivers contends that the state's above emphasized questions improperly led H.W., the question posed to H.W. with respect to how he was holding the gun appears to attempt to articulate H.W.'s demonstration for the record and properly develop the testimony. The question regarding Rivers not holding the gun to H.W.'s head, if improperly leading, was not prejudicial to Rivers. The questions pertaining to whether H.W. was scared or had cause for concern, if somewhat prejudicial, would not appear to affect the outcome of the trial given the remainder of the evidence. The question posed to H.W. regarding her relationship with Rivers being "problematic," is not prejudicial, as this characterization of their relationship does not directly bear upon the charges. The question regarding Rivers' admission that he entered the residence through the window, if error, does not amount to plain error.

{¶29} Next, Rivers challenges the state's questioning of H.W. just prior to the state publishing certain jail-call recordings to the jury. At that point in the proceedings, the state had just confirmed to the court that the recordings contained admissions. The state then inquired of H.W. as follows:

> Q    And I guess just to further that point, you're aware of what's on these jail calls, right?
>
> A    Yes.
>
> Q    You're aware that he makes numerous admissions?
>
> A    Yes.

11

Q     He tries to get you to lie on these calls, right?

A     Yes.

Q     Tries you get you to not show up on these calls, correct?

A     Yeah.

{¶30} Although these questions may have been unnecessarily leading, the content of the recordings was played for the jury and admitted as an exhibit, and the jury was thus able to assess the recordings. Accordingly, H.W.'s testimony characterizing the contents of these calls was not prejudicial.

{¶31} Next, Rivers argues that, during direct examination of A.R., the state improperly led A.R. in questions pertaining to: Rivers' relationship with H.W., their breakup, the court's jurisdiction, the date and time of the offense, the events of the early evening on March 25, 2020, speculation about how Rivers came to the house, and A.R.'s fear and suspicion that Rivers had entered the house. After review of the questions regarding these topics, we have found no improperly leading questions that resulted in prejudice.

{¶32} Further, Rivers maintains that the state impermissibly led A.R. in its questions regarding whether the victims' guns were loaded, ready to fire, and operable:

Q     Your firearm, was that loaded and locked, ready to go?

A     Yes.

Q     Okay. So you keep one in the chamber as well?

A     Yes. Yes.

Q     So if you were to pull the trigger on that firearm it would discharge?

12

A       Yes.

Q       Okay.  Do you know how [H.W.] kept hers?

A       I'm not sure.

Q       Are you aware that was also loaded though?

A       Yes.

{¶33}  Rivers also maintains that the state improperly led the officer regarding the

operability of the firearms during his direct testimony:

Q       Thank you. You had no involvement in the initial call during this case, is that fair to say?

A       Correct.

Q       Okay.  You were called after the fact, right, I believe in March of 2022 for something called firearm operability, is that right?

A       Correct.

Q       You're aware that in a weapons under disability case, which this is, that's been alleged, one of the things we need to prove is that the firearms are operable, they shoot bullets, right?

A       Correct.

Q       Okay.  So I called your station, said hey, will you guys test these guns for me, is that accurate?

A       Yes.

Q       Okay.  So I'm going to hand you what's been marked as State's Exhibits 1 and 2. They are safe. Ask you if you recognize them, and I think some of the paperwork associated with them?

A       I do.

Q       And were they the firearms seized in this case by [the responding officer]?

13

Case No. 2023-T-0001

A    Yes.

Q    And were they the same firearms that you tested at my request?

A    Yes.

Q    Okay.  So to just sort of make this quick hopefully, to test those guns what do we do?  We put a bullet in them and we pull the trigger, right?

A    Yes.

Q    And did you do that with both of those guns in this case?

A    Yes.  There was four rounds of live ammunition put into the magazines, then into the gun.  Each gun was shot four times consecutive with the proper ammo. The SS -- or the SCCY nine millimeter, that functioned properly four consecutive rounds. The Kahr .380, it did fire correctly, but whenever the next round was being chambered, the slide didn't go all the way forward so I had to force the slide forward for the next round to seat and be operational.

Q    Nevertheless, the guns worked, both of them?

A    Correct.

Q    So at the end of the day both firearms are operable based on your testing?

A    Yes.

Q    I'm going to hand you what's also been marked as State's Exhibit 3.  You complete a report just putting that in writing, is that accurate?

A    Yeah.  The chief was there as a witness when I was firing the guns and he typed this up.

{¶34} Despite the leading questions posed to A.R. and the officer regarding the

guns, some of these questions appear to develop the testimony and were not improper.

14

Case No. 2023-T-0001

Further, as the officer's operability report was entered into evidence, we can discern no prejudice resulting from the state's leading questions regarding the operability of the guns.

{¶35} Next, Rivers maintains that he was denied a fair trial because the state repeatedly interrupted and criticized him as he attempted to develop his case.

{¶36} In support, Rivers identifies the emphasized remarks contained in the trial excerpts reproduced below. First, during Rivers' cross-examination of H.W., Rivers inquired as to her assisting him after the incident. Thereafter, the following exchange occurred.

Q    Isn't it true you filled up your refrigerator and cabinets with only things that I like?

[THE STATE]: Objection. Judge, I feel like he intends to do this forever. I literally think this may take three days. I think he's just getting warmed up. At some point I think the Court needs to restrict this a little bit. I mean, this is just meandering and nonsensical, talking about food in the cupboards or something. I'm going to object on relevance grounds.

THE COURT: What is the relevance?

[THE STATE]: *I'll stipulate that she loves him in some way, you know, some twisted way. I'll agree to that.*

THE COURT: Well, you've already stated that. I don't see the relevance at this point. The objection is sustained.

BY [RIVERS]:

Q    [H.W.], isn't it true at no point in time have you stated that I broke into your residence?

A    I have stated that you broke into my residence, yes.

Q    And that was -- was that oral or somewhere written?

A    You mean as far as in court or just --

Q    Or a phone call, the phones, or what?

15

THE COURT: Listen, if you -- if you are saying she's made a prior statement that is different, point it out exactly, don't just say forever and ever. It's hard to follow this.

[RIVERS]: Well, I figured the objective is to allow her to answer questions and try not to just be direct, too direct with the --

[THE STATE]: *Be direct.*

[RIVERS]: Oh, okay.

[THE STATE]: Please.

THE COURT: Please be specific. If you have a prior inconsistent statement, point it out and ask her if she made it.

* * *

Q       [H.W.], did you tell us why -- could you tell us what your purpose is for doing this?

[THE STATE]: Objection.

THE COURT: Sustained.

BY [RIVERS]:

Q       [H.W.], what made you participate in this case?

[THE STATE]: *Objection. She's under subpoena, judge.*

THE COURT: I understand. Listen, an incident happened. She is required to testify and that's all. That's the only interest that she has to my knowledge. Is that not correct?

A       Yes.

THE COURT: Is there any other interest than what I just said?

A       No.

THE COURT: Move on.

A       I wouldn't be here if I didn't have to.

16

Case No. 2023-T-0001

(Emphasis added.)

{¶37} Next, during Rivers' cross-examination of A.R., the following exchange occurred while she reviewed an exhibit offered by Rivers:

Q       That's the victim's impact statement, correct?

A       Right.

Q       [A.R.], I hate to break it to you --

[THE STATE]: Objection. *He's not breaking anything to anybody, he's asking questions right now.*

THE COURT: That's right.  Ask questions.

BY [RIVERS]:

Q       Do you know -- did you know, or how do I say that?  Do you know that it's impossible for you to have done that in 2020?

{¶38} Rivers maintains that the emphasized statements amounted to misconduct because the comments belittled him, unduly interfered with his examinations, and amounted to "interruptions to throw [Rivers] off the trail."  However, despite Rivers' characterization of the comments, he cites no law in support of his position that these comments amount to misconduct.  Further, some comments Rivers cites were speaking objections where the trial court agreed with the basis for the objection advanced by the state.

{¶39} Last, Rivers argues that the prosecutorial misconduct consisting of the improperly leading questions and improper comments amounts to cumulative error.  With respect to the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each

17

of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987).

{¶40} Here, having reviewed each of the alleged errors, we conclude the none of the purported errors either individually or cumulatively denied Rivers a fair trial.

{¶41} Accordingly, Rivers' first assigned error lacks merit.

{¶42} In his second assigned error, Rivers maintains:

{¶43} "The Court committed reversible error when it denied a mistrial and failed to inquire as to jurors who saw Rivers in handcuffs."

{¶44} "A trial court is entitled to broad discretion in considering a motion for a mistrial, and our standard of review is whether the trial court abused its discretion." (Citations omitted.) *State v. Rosebrook*, 11th Dist. Geauga No. 2016-G-0099, 2017-Ohio-9261, ¶ 9. "The decision to grant a mistrial 'is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice.'" *Id.*, quoting *State v. Bigsby*, 7th Dist. Mahoning No. 12 MA 74, 2013-Ohio-5641, ¶ 58, citing *State v. Jones*, 83 Ohio App.3d 723, 615 N.E.2d 713 (2d Dist.1990).

{¶45} Here, Rivers based his motion for a mistrial on his position that several jurors saw him outside of the courtroom in shackles. The Ohio Supreme Court has held that although "no one should be tried while shackled, absent unusual circumstances, * * * the danger of prejudice to defendants is slight where a juror's view of defendants in custody is brief, inadvertent and outside of the courtroom." (Citations omitted.) *State v. Kidder*, 32 Ohio St.3d 279, 285-86, 513 N.E.2d 311 (1987).

18

{¶46} Rivers requested the mistrial during his cross-examination of H.W., when the following exchange occurred:

[RIVERS]: Your Honor, I'm going to have to ask you to request or call for a mistrial.

[THE STATE]: Wait.

[RIVERS]: You have three jurors --

[THE STATE]: Wait. Should we handle this, should we handle this in --

[RIVERS]: You have three jurors that was outside and seen me handcuffed so they know I'm in jail.

THE COURT: Okay. Hold on a second.

[RIVERS]: They know I'm in jail right now.

THE COURT: Hold on, sir. Sir, I'm going to take this outside the hearing of the jury because I don't know what you're going to say here.

{¶47} The court then instructed Rivers to finish his cross-examination and informed him that his motion would be heard thereafter. Subsequently, outside of the presence of the jurors, the court heard Rivers on his motion:

THE COURT: Okay. Mr. Rivers, you have a motion for mistrial you want to make at this time? Please go to the podium.

[RIVERS]: Motion for mistrial, Your Honor, due to I can point out four jurors seeing me walk outside with shackles and handcuffs on. They know I'm in jail so it ain't no point in wearing this, is it? I might as well be in the oranges.

THE COURT: It happens all the time, sir.

[RIVERS]: So the presumption of innocence is out the window.

THE COURT: That's not true. I've told them it is.

19

Case No. 2023-T-0001

[RIVERS]: How not?

THE COURT: Your motion for mistrial on that ground is denied. Next. Anything else?

[RIVERS]: I mean, I would like to motion for dismissal on grounds of perjury.

THE COURT: At this point that's denied, too. Next. There's no evidence of that, sir.

[RIVERS]: I mean, it actually is.

THE COURT: There is no evidence of that. Your motion for dismissal for perjury is denied. Next.

[RIVERS]: What is he scared of? It's just me.

[THE STATE]: What am I scared of? I'm just sitting here.

[RIVERS]: It's just me. Play the tapes. It's just me.

THE COURT: What are you talking about?

[RIVERS]: It's just me.

THE COURT: Okay. Do you have any other motions to make at this point?

[RIVERS]: Why don't you just admit what you've been doing?

THE COURT: Sir. Mr. Rivers, do you have any motions to make at this point other than what you've done?

[RIVERS]: No. I just told you, they just seen me out there, walked right across. I looked at him and he looked at me.

THE COURT: And I told you I'm denying that motion. We're in recess.

[RIVERS]: We're going to have to get new jurors, right?

(Whereupon, a brief recess was taken.)

{¶48} After court resumed, the court addressed the jury as follows:

20

Case No. 2023-T-0001

Okay. Ladies and gentlemen, if you remember at some point during the last witness's testimony the defendant made a motion for a mistrial. I heard that motion outside your hearing and I've denied that motion. We're going forward. I will say this to you though, that these cases are sometimes a little difficult to orchestrate, and if you see the defendant in some kind of shackles, it's for security reasons outside and you are not to consider it for any purpose having to do with anything with this case. All right. Next witness.

{¶49} Given the jurors' limited observation of Rivers in restraints outside of the courtroom, the fact that Rivers announced to the entire jury that he was in custody when he made his motion during cross-examination, and the court's admonishment to the jurors to not consider the shackles for any purpose, we cannot say that the trial court abused its discretion in denying a mistrial or in failing to question the affected jurors. Accordingly, Rivers' second assigned error lacks merit.

{¶50} In his third assigned error, Rivers contends:

{¶51} "The trial court incorrectly decided that the two gun specifications on Count One did not merge."

{¶52} In his stated assigned error, Rivers contends that the trial court erred in failing to merge the two gun specifications attendant to the aggravated burglary count. However, the entirety of Rivers' argument in support of his third assigned error pertains to merger of the counts of having weapons while under disability. As the trial court did merge the two counts of having weapons while under disability, and Rivers advances no argument as to why the trial court erred in failing to merge the two gun specifications, his third assigned error lacks merit. *See* App.R. 16(A)(7) (Appellant shall include in his brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions,

21

Case No. 2023-T-0001

with citations to the authorities, statutes, and parts of the record on which appellant relies.).

{¶53} In his fourth assigned error, Rivers argues:

{¶54} "The Trial Court committed reversible error when it permitted Rivers to try his case pro se when he lacked the requisite understanding of law, procedure, and the arguments applicable to his case."

{¶55} "A criminal defendant's right to self-representation is rooted in the Sixth Amendment to the United States Constitution, which provides: 'In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defence.'" *Obermiller*, 2016-Ohio-1594, ¶ 25. "The Sixth Amendment right to counsel 'implicitly embodies a "correlative right to dispense with a lawyer's help."'" *Obermiller* at ¶ 26, quoting *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 23, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

{¶56} The right of a defendant to self-representation "is thwarted when counsel is forced upon an unwilling defendant, who alone bears the risks of a potential conviction." *Obermiller* at ¶ 26, citing *Faretta v. California*, 422 U.S. 806, 819-820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta*, the United States Supreme Court held:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the

22

Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

{¶57} "[T]he Sixth Amendment 'guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.'" *Obermiller* at ¶ 28, quoting *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus, citing *Faretta*. Thus, where a defendant elects to represent himself, "[t]he court must be satisfied that the waiver of the right to counsel is knowing and voluntary, and the court's colloquy must ensure that the defendant has been 'made aware of the dangers and disadvantages of self-representation.'" *Obermiller* at ¶ 43, quoting *Faretta* at 835. "The specific nature of the colloquy varies from case to case, depending on the nature and circumstances of the charged offenses and potential penalties the defendant faces." *Obermiller* at ¶ 43.

{¶58} Here, during the hearing on defense counsel's motion to withdraw, Rivers stated that he wished to proceed pro se. After addressing the charges and potential penalties in this matter, the court engaged in the following colloquy with Rivers:

THE COURT: Well, let me ask you this. You understand that your current lawyer has experience in criminal law and trying cases and things like that, and handling jury matters and criminal trials in general, and you do not have that experience, do you?

[RIVERS]: No, I do not.

THE COURT: Doesn't that bother you?

[RIVERS]: No, it does not, Your Honor.

23

THE COURT: All right. Do you understand that you have a constitutional right to have an attorney represent you in this matter?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: All right. And an attorney would be required to do everything that an attorney can honestly do to help you. Do you understand that?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: The attorney will investigate the case, talk to witnesses, study the law and defend you at trial. Do you understand that?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: No one, not even the Court, can take that right away from you except you yourself if you wish to try your case. Do you understand that?

[RIVERS]: Yes, Your Honor.

THE COURT: All right. Do you understand that a defendant who represents himself may impart to a jury a negative or bad feeling since a lawyer is not present to handle your case?

[RIVERS]: Yes, Your Honor.

THE COURT: Do you understand that you'll be held to the same rules of evidence that bind any lawyer who represents a client in this court in a similar type of case?

[RIVERS]: Yes, Your Honor.

THE COURT: Have you ever represented yourself before in any criminal action?

[RIVERS]: Yes, Your Honor.

THE COURT: What was that?

[RIVERS]: That was in Mahoning County and it was a trafficking case.

24

Case No. 2023-T-0001

THE COURT: What happened in that case.

[RIVERS]: That case did not go to trial. They threatened someone in my family so, yeah, I (sic.) didn't go forward.

THE COURT: Do you know anything about that, [defense counsel]?

[DEFENSE COUNSEL]: Your Honor, looking at the docket, it was a 2019-CR case out of Mahoning County. The case did resolve in a plea agreement.

THE COURT: And he represented himself in that case?

[DEFENSE COUNSEL]: Yes, Your Honor. He started off with [an attorney] and then ended the case representing himself.

THE COURT: All right. And you entered into a Rule 11 agreement on that case representing yourself?

[RIVERS]: Yes, Your Honor.

THE COURT: All right. Have you ever represented yourself in front of a jury before?

[RIVERS]: No, I have not, Your Honor.

THE COURT: Does that give you any pause?

[RIVERS]: No, it doesn't, Your Honor.

THE COURT: All right. Do you have any educational background in legal matters?

[RIVERS]: Not on paper, no, Your Honor.

THE COURT: What other experience do you have?

[RIVERS]: Just going through the court system.

THE COURT: All right. Are you familiar with the rules of criminal procedure in this case in this state?

[RIVERS]: Yes, I am, Your Honor.

THE COURT: How are you familiar with those?

25

Case No. 2023-T-0001

[RIVERS]: From reading the law, understanding the law books.

THE COURT: You read law books?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand that within our system there are rules conducting the way this trial should proceed and they must be obeyed? Do you understand that?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand that you will be bound by those same rules as any other lawyer would be?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand that you'll be held to that same standard as any lawyer who might appear in a similar matter representing his client?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Are you familiar with the Rules of Evidence in this state?

[RIVERS]: Yes, I am, Your Honor.

THE COURT: That comes from reading law books?

[RIVERS]: Yes, Your Honor.

THE COURT: Do you understand that you will be required to follow those Rules of Evidence just like any other lawyer would be in this case.

[RIVERS]: Yes, I do, Your Honor.

THE COURT: The rules make it a little difficult for you to ask questions in a way that you might like to ask a question. Since you are not familiar with the Rules of Evidence, you may not know the appropriate way to form a question and this may cause you problems in questioning the witnesses, et cetera. Do you understand that?

26

Case No. 2023-T-0001

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand that the Court cannot function as your lawyer in this case at all? I can't give you any legal advice. Do you understand that?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: All right. To summarize, do you understand that you'll be held to the same rules as the prosecutor in this case?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand this, if you represent yourself you will give up the right to later claim you did not have effective and proper legal counsel?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: In essence, do you understand that you'll give up the right to say my lawyer did not do a good enough job by trying this yourself?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Do you understand that you may lose an appeal on evidence issues on the other part of the trial because you do not know how to make the proper objection?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Okay. You understand what you're indicted for?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: And do you understand they are serious felonies?

[RIVERS]: Yes, I do, Your Honor.

THE COURT: You understand that the Court may at some point if you're convicted, I may want to sentence you to consecutive terms imprisonment? Do you understand that?

27

[RIVERS]:  Yes, I do, Your Honor.

THE COURT:  Do you understand that you will be treated no differently than if you had a lawyer representing you?

[RIVERS]:  Yes, I do, Your Honor.

THE COURT:  Do you know what defenses are available in your case?

[RIVERS]:  Come again?

THE COURT:  Do you know what defenses are available to assert to a jury in this case?

[RIVERS]:  Yes.

THE COURT:  Do you understand that an attorney may be aware of ways of defending you that you may not be aware of?  Do you understand that?

[RIVERS]:  Yes, I do, Your Honor.

THE COURT:  And you understand that I can't give you any kind of legal advice in these matters?

[RIVERS]:  Yes, I do.

THE COURT:  There's an old saying that a man who as (sic.) his own lawyer has a fool for a client.  Do you understand what is meant by that?

[RIVERS]:  No, I do not, Your Honor.

THE COURT:  It's another way of saying you should have a lawyer represent you because otherwise you would have a fool for a client.  It's another way of saying that.  That's what -- do you understand that?

[RIVERS]:  Yes, I do, Your Honor.

THE COURT:  Now, in light of all the penalties that you might suffer if you are found guilty and in light of the difficulties of representing yourself, do you still desire to represent yourself and give up your right to be represented by a lawyer.

28

Case No. 2023-T-0001

[RIVERS]: Yes, I do, Your Honor.

THE COURT: Okay. I'm going to have handed to you, its called a waiver of counsel. I want you to read this before you sign it because you're giving up your right to counsel and I want to make sure that you understand what's going on here because, quite frankly, I think you should have a lawyer represent you in this case.

[RIVERS]: Well, there are things I would love to address to the State, Your Honor, for the record, if I may, after I'm done reading.

THE COURT: Now, are you making this decision freely and does it reflect your own personal desire?

[RIVERS]: Yes, Your Honor.

THE COURT: Do you have any questions about your right to counsel and what so far we've gone through that you want me to explain.

[RIVERS]: No, I do not, Your Honor.

THE COURT: Now I would like to address the issue of standby counsel. I'm going to appoint the Public Defender's office to be your standby counsel. They will be here to take over at any time you decide that you want them appointed or at any time where it's necessary because you decide not to go forward or some other issue that comes up in trial. And counsel will be there to make sure this trial goes forward. Do you understand that?

[RIVERS]: Yes, I do. I mean, I would like to object to that.

THE COURT: Well, I don't care whether you object to it or not because this trial when we set it its going to go forward from beginning to end. That's it.

[RIVERS]: Okay.

THE COURT: If you voluntary (sic.) absence yourself or do something wrong in Court, standby counsel will try it to its conclusion. That's the way it goes. Or any time that you ask

29

to have a lawyer appointed for you, it will go forward then from that point on. Do you understand that?

[RIVERS]: Yes, Your Honor.

THE COURT: All right. You're going to be standby counsel on this case.

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: All right. Are you still sure you wish to represent yourself.

[RIVERS]: Yes, Your Honor.

THE COURT: Okay. The Court will find a knowing, intelligent, and voluntary waiver of your right to counsel. I will therefore sign this document and set it for the record.

{¶59} Rivers maintains that the court identified "some disadvantages" during its discussion with him, but it did not ascertain whether Rivers had a broad understanding of the entire matter. In support, Rivers maintains, "The record is clear that Rivers did not understand how to develop his defenses. He was openly confused. He was repeatedly corrected during his questioning by the court. He was unable to develop prior inconsistent statements from June 3, 2022." (Trial transcript citations omitted.)

{¶60} The state responds that the fact Rivers was not skilled at self-representation does not negate the fact he knowingly, intelligently, and voluntarily waived his right to counsel. We agree. "The defendant 'need not himself have the skill and experience of a lawyer' in order to choose to represent himself, but he 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."'" *Obermiller*, 2016-Ohio-1594, at ¶ 30, quoting *Faretta*, 422 U.S. at 835, quoting *Adams*, 317 U.S. at 279. "Whether a defendant's choice was made with eyes open typically 'depend[s], in each

30

case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Obermiller* at ¶ 30, quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

{¶61} Here, the trial court's inquiries demonstrate that Rivers made his choice with "eyes open." Further, we agree with the state that Rivers is essentially attempting to argue his own ineffectiveness. *See State v. Ciboro*, 6th Dist. Lucas No. L-17-1045, 2018-Ohio-4627, ¶ 7 (defendant who validly waives his right to counsel is barred from asserting an ineffective assistance of counsel claim).

{¶62} Accordingly, Rivers' fourth assigned error lacks merit.

{¶63} The judgment is affirmed.

MARY JANE TRAPP, J.,

ROBERT J. PATTON, J.,

concur.

31

Case No. 2023-T-0001